G. B. JOHNSON et al.

*vs.*

THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD, and Trustee.

Cumberland.   December 6, 1913.

*Common Carriers. Damages. Delay. Directing Verdict. Exceptions. Negligence. Perishable Goods. Reasonable Diligence. Special Contract.*

1. Upon exceptions to an order of nonsuit or of verdict for defendant, the duty of the court is simply to determine whether, upon evidence, under the rules of law, the jury could properly have found for the plaintiff.

2. If there was evidence which the jury were warranted in believing, it is reversible error to take the issue from the jury.

3. It is the duty of the forwarding carrier, and as well, the duty of all con·necting carriers, to exercise reasonable care and diligence in transportation, to transport in a reasonable time, without unnecessary delay, to prevent so far as reasonable and practicable any loss or damage which may be occasioned by delay in transit.

4. In the absence of a special contract, or of special circumstances which take the case out of the general rule, the carrier is not bound to use extraordinary means to forward even perishable freight.

5. The carrier is not bound to make up special trains or perform special service.

6. The shipper must be understood to contemplate carriage by the regular trains on the ordinary schedules. If he desires special service, he may contract for it.

7. It is not unlawful for a carrier to give priority in carriage to berries and other perishable goods. Nor is it an unlawful discrimination for a carrier to expedite a switching service for perishable goods, provided the service is extended to all shippers of that class of goods.

8. To "mail" a letter to a person means to deposit it in the mail properly stamped and properly addressed. And that is prima facie evidence of delivery by due course of mail to the addressee.

On exceptions by the plaintiff. Exceptions sustained. Judgment for the plaintiff for $233.17.

This is an action on the case against the defendant company as a common carrier to recover damages occasioned by the alleged negligent delay in transporting a car of strawberries from the defendant's freight yard in South Boston, Massachusetts, to Auburn, Maine. At the conclusion of the evidence, the presiding Justice ordered a verdict for the defendant with an agreement on the part of the defendants that if this order is overruled, the Law Court may enter judgment for the plaintiffs for the sum of $233.17. To this order of verdict for defendants, the plaintiffs excepted. Plea, general issue.

The case is stated in the opinion.

*Oakes, Pulsifer & Ludden,* for plaintiffs.

*Symonds, Snow, Cook & Hutchinson,* for defendant.

*N. & H. B. Cleaves & S. C. Perry,* for trustee.

SITTING: SAVAGE, C. J., CORNISH, KING, BIRD, PHILBROOK, JJ.

SAVAGE, C. J. Case for damages occasioned by alleged negligent delay in transportation of a car of strawberries from the defendant's

freight yard in South Boston, Massachusetts, to Auburn, Maine. The case comes before us on exceptions to an order of a verdict for the defendant, with a stipulation that if the exceptions are sustained and the order overruled, the Law Court is to enter judgment for the plaintiff.

Upon exceptions to an order of nonsuit or of verdict for the defendant, the duty of the court is simply to determine whether, upon the evidence, under the rules of law, the jury could properly have found for the plaintiff. We are not called upon to express our own judgment of the probative force of the testimony. Whatever our own conclusions might have been, if there was evidence which the jury were warranted in believing, and upon the basis of which honest and fair minded men might reasonably have decided in favor of the plaintiffs, then the exceptions must be sustained. In such a case it is reversible error to take the issue from the jury.

We have carefully examined the evidence in this case. There is not much controversy about the facts. And where there is a dispute, there are no circumstances which take the testimony out of the operation of the general rule that a jury is the proper tribunal to determine the credibility of witnesses.

We think a jury might reasonably find the following facts to be true. In the early morning of June 21, 1909, a car of strawberries from New Jersey or Delaware came over the defendant's road into its yard at South Boston. It was consigned to one Littlefield. Littlefield removed some of the strawberries, and sold the rest of them in the car to the plaintiffs, to be shipped to Auburn. He received a bill of lading, by which the car was routed over the Union Freight railroad and the Boston & Maine railroad. The defendant knew that the car contained strawberries, and of course knew that they were perishable. Notice of the order to ship the car to Auburn was received at the defendant's Agent's Department as early as 6.45 A. M. that day, and was received by the Yard Department at 9 or 9.30 A. M. The car was not moved, however, until 9.15 P. M., when, following the usual route of freight going to the Boston & Maine Railroad, it was taken over various tracks of the defendant, of the Boston Terminal Company, and of the Boston & Albany railroad to Dover Street. There it was taken at 1.10 A. M. June 22, by the Union Freight railroad, having been about eighteen hours

traversing a distance of two miles or less. The Union Freight railroad hauled it a distance of less than two miles and delivered it to the Boston & Maine at 6.20 A. M. It remained with the Boston & Maine in Boston until 1.50 P. M. Then that company hauled it to Portland and delivered it to the Maine Central railroad at 5.20 A. M., June 23. It finally reached Auburn at noon of that day. It had come about one hundred and fifty miles in the fifty-three hours after the order of shipment was given. The strawberries, when received at Auburn, were in a badly damaged condition, due to delay in transit.

The plaintiffs do not count upon any special contract, but upon the general liability of the defendant as a common carrier, and as the initial carrier. They claim that the defendant was itself the chief offender in respect to negligent delay, but that the subsequent carriers were also negligent. They contend however that the defendant as initial carrier is liable for the whole damage under 34 U. S. Statutes (1906), ch. 3591. There was also evidence which a jury would be warranted in believing, that in the ordinary course of carriage, berries ordered shipped as these were should reach Auburn from 4 to 6 o'clock the next morning.

The duty of the defendant, as the forwarding carrier, and as well, the duty of all connecting carriers, was to exercise reasonable care and diligence in transportation, to transport in a reasonable time, without unnecessary delay, to prevent so far as is reasonable and practicable any loss or damage which may be occasioned by delays in transit. *Fisher* v. *Railroad Co.,* 99 Maine, 338. What is reasonable diligence in this class of cases, as in all others where reasonableness is the standard, must depend upon the circumstances of the particular case. It has been held that the carrier may discriminate under some circumstances between different classes of goods when the exigencies require it, as where one class is perishable and the other is not. In such case, if unable to carry both classes at the same time, the carrier may give priority of carriage to the perishable goods. And there are other emergencies which may call for discrimination. *Marshall* v. *New York Central R. R. Co.,* 45 Barb., 502; *Peet* v. *Chicago & N. W. Ry. Co.,* 20 Wis., 594; Wyman, Public Service Corporations, sects. 840, 841.

On the other hand, in the absence of a special contract, or of special circumstances which take the case out of the general rule, the carrier is not bound to use extraordinary means to forward even perishable freight.   It is not bound to make up special trains or perform special service.   The shipper must be understood to contemplate carriage by the regular trains on the ordinary schedules.   If he desires special service he may contract for it.

In this case there was no special contract.   But it was the duty of the defendant, we think, to forward such perishable freight as strawberries at least by its earliest scheduled opportunity or by the earliest train it made up in the course of its business; and in any event, at as early an hour as it had given the shipper reason to understand that it would be forwarded.

If there were no other facts than those already stated, we think a jury would be warranted in saying that there was unreasonable delay somewhere in forwarding and transporting this car of strawberries, the time occupied being fifty-three hours instead of twenty-four hours or less, the ordinary time.   It is so far sufficient that it puts the onus of explanation on the defendant.

In defense the following additional facts are shown.   The car at 6.45 A. M. June 21, was in the defendant's yard.   To get it to the Boston & Maine it was necessary to get it over the tracks of the Boston Terminal Company to the Union Freight Company.   There is no direct trackage from the defendant's yard to the Union Freight Company.   The Boston Terminal tracks, which at the train shed are twenty-eight in number, lie between.   Cars are shifted from defendant's yard to the Union Freight Company by being switched back and forth from track to track on the Terminal Company's tracks.   Several hundred passenger trains daily enter and leave the Terminal Company's station, known as South Station.   During the hours of passenger train service, or between 6 A. M. and midnight, no freight was allowed to be hauled over the Terminal Company's tracks without special permission of the Terminal Company.   But it appears that special permission was given from time to time, when the defendant asked for it.

Another reason assigned for restricting the movement of freight to the hours of the night is the fact that the Union Freight Company's tracks lay in Atlantic Avenue and other crowded streets in

the city of Boston, in which there was much traffic and heavy teaming in the day time. But it appears also, that notwithstanding this fact, the Union Freight Company from time to time did haul cars along these streets and to the Boston & Maine in the day time. The inference therefore is that, the parties being willing, it was not impossible, nor impracticable, to move freight cars to the Boston & Maine in the day time.

In the usual course of transportation, three trains only were scheduled to be made up and sent from the defendant's yard to the Boston & Maine. One was due to leave at 9.15 P. M. and the other two at 2 A. M. and 4 A. M. respectively. And the defendant points out that the plaintiff's car left the defendant's yard at 9.15 P. M. on the very first train, according to schedule, which left the yard after the order to forward had been given in the morning. The defendant contends further that the car went by first trains also on each of the connecting roads. This does not appear to be quite true with respect to the Boston & Maine. The car was delivered to that company at 6.20 A. M., June 22. There were two freights leaving for Portland that forenoon, one at 10.18 and one at 11.25. The car was not sent on either of these trains. It did not start until 1.50 P. M. What connection the two earlier trains had in Portland with Maine Central trains does not appear. But if it be true, as the testimony is, that berries purchased in Boston and forwarded by Boston & Maine one day, in the usual course of carriage, arrived in Auburn at 4 or 5 or 6 o'clock the next morning, it seems to be a reasonable inference that the Boston & Maine, which had this car in its possession at 6.20 A. M., June 22, might by the exercise of reasonable diligence have forwarded it on the train that would reach Auburn in the morning, instead of one that did not reach there until six or eight hours later, at noon. It may be that this delay can be explained, but no explanation is offered. And it may be that a jury might reasonably conclude that this shorter delay was unreasonable and damaging to the plaintiffs. But we do not rest our decision wholly on this ground.

The plaintiffs, in reply to the defendant's contention, and conceding that during most of the year freight was moved across the Boston Terminal tracks only in the night time, say that during the "berry season" a different practice prevailed as to berries and like

perishable stuff. The plaintiff's buyer testified in effect that the commission men, the fruit and produce men, of whom he was one, complained to the defendant's superintendent of freight that the refusal to transfer berries and the like in the day time would hurt the business, and that after conference an understanding was reached that such freight would be forwarded in the daytime. That such a practice was in vogue at some time cannot be questioned. The defendant's witness, who was yard-master, admits it. He testifies that it was the custom during the heaviest of the season, when requested by the fruit and produce people for the railroad, without extra charge, to transfer cars of perishable goods in the daytime, if agreed to by the Union Freight Company, and there were three cars or more. But he testified that this arrangement was not in effect June 21, 1909. The plaintiffs introduced evidence tending to show that it was in effect then, that then, by the usual course of business, if a car was ready for shipment before 9 A. M. it would be moved by the defendant and connecting carriers so as to be in Auburn the next morning. And a jury might properly have sustained the plaintiff's claim in this respect.

But the defendant says that if in point of fact the plaintiff's contention is true, yet it is not liable as a matter of law. It appears that the defendant had provided for a special switching service, for which it had established a special tariff, approved by the Interstate Commerce Commission. And it contends that the service for want of which the plaintiffs complain was such a special switching service; that such service might be rendered upon request of shippers or consignees; that for rendering such service it was entitled to receive the special tariff rate of $30; that neither the shipper nor the consignee asked for such service, and the tariff rate was not paid nor tendered. It says further that it could not lawfully engage to render such service to the plaintiffs without exacting the scheduled compensation, because to do so would be a violation of the federal Commerce Act, and that it is not liable in law for the failure to perform an unlawful engagement, even if such an engagement was made.

It is true that a common carrier engaged in interstate commerce has no right to grant special favors to anybody. To agree with a particular shipper to expedite a shipment at regular rates, even

where no rate has been established for special expediting, is a discrimination, and as such a violation of the Elkins Act of February 19, 1903, 32 Stat. 847, chap. 708. It was so held in *Chicago & Alton Ry.* v. *Kirby,* 225 U. S., 155. A carrier cannot legally contract with a particular shipper for an unusual service unless he make and publish a rate for such service equally open to all. *Kansas Southern Ry.* v. *Carl,* 227 U. S., 639. Discrimination is forbidden.

We think, however, that the case at bar does not fall within the rule just stated. The language used in the order providing for special switching service is as follows: "Where Special Switching Service has been arranged by the Operating Department upon request of shippers or consignees the following rates will be charged for such Special Switching Service." As we construe this language, it means a service rendered at the request of individual shippers or consignees, a service rendered under a special contract or engagement, and not a service which it had bound itself to render to all shippers or consignees similarly situated, and which was open to all. As we have already seen, it is not unreasonable nor unlawful for a carrier to give priority in carriage to perishable goods. And it does not seem to us to be an unreasonable and unlawful discrimination for a carrier to expedite a switching service for a class of goods, perishable in their nature, like strawberries, provided the service is extended to all shippers of that class of goods. Such expedition is reasonable, if not absolutely necessary.

And where a carrier has undertaken to perform such a service for all similarly situated, without additional compensation, the undertaking to do so is implied in the general contract for carriage,· under its tariff for that class of goods. That is, having undertaken to do this service for all of this class of shippers, the undertaking becomes a part of each contract of carriage, and the carrier is bound to perform this service as a part of the duties created by the contract, for which the rates in its general tariff schedule will be presumed to be sufficient compensation. We think that under such a contract it would be as much the defendant's duty to expedite the transfer in Boston as to haul the car from New York to Boston, had its shipment been made from New York.

But the defendant says that it did not own or control all of the tracks necessary for the transfer, and that its power to transfer

was subject to the will of one or two other independent corporations. We think the course of business at the Boston Terminal, as shown by the case, was such that if a jury should find that consent would have been given for the transfer, if requested, and if the verdict rested upon that issue, we should not feel warranted in disturbing it. In this case, however, there was no request and no refusal. The defendant took no step to expedite. Nor did it give any notice to the plaintiffs of its unwillingness or inability to expedite. If, as we think a jury might properly find, it had held out to the plaintiffs that it would expedite, we think a jury might also properly say that it failed to perform its full duty as carrier, and is liable to the plaintiff for damages caused by unreasonable delay.

At the trial, the defendant claimed that it had not been shown that the plaintiffs had made claim in writing either upon it, or upon the carrier at the point of delivery, the Maine Central, within four months after delivery, as required by the bill of lading. This point is not much pressed in argument, and cannot be sustained. The evidence is that the claim was seasonably "mailed" to the Maine Central. Whatever may have been the rule in the days of primitive mail service, and before prepayment of postage, such is now the regularity and the certainty of the service, and the universality of the prepayment of postage, that, by common acceptation, to "mail" a letter to a person means to deposit it in the mail properly stamped and properly addressed. And that is prima facie evidence of delivery by due course of mail to the addressee. *Chase* v. *Surrey,* 88 Maine, 468.

It follows from what has been said that there was sufficient evidence on the question of the defendant's liability to require the case to be submitted to the jury, and that the order of a verdict for the defendant was error. This being so, in accordance with the stipulation of the parties, the certificate will be,

*Exceptions sustained.*
*Judgment for the plaintiffs*
*for $233.17.*