RALPH B. SANBORN
*vs.*
ELMORE MILLING COMPANY, INC.

Cumberland.    Opinion, February 21, 1957.

*Daniel C. McDonald,* for plaintiff.

*Barnett I. Shur,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, JJ., MURRAY, A. R. J.

TAPLEY, J.    On exceptions.    Plaintiff seeks to recover damages from the defendant for the loss of some turkeys by death and the retarded growth of other turkeys occasioned, as he says, by improper feed furnished by the defendant. It is claimed that the feed purchased from the defendant and fed to the birds contained a sulfa quinoxaline content in an amount over that specified and guaranteed by the defendant, which so adversely affected the birds as to cause death of some and retard the growth of others.

The case was tried before a jury in the Superior Court, within and for the County of Cumberland. After completion and conclusion of the evidence, the court, upon motion of the defendant, directed a verdict in favor of the defendant. To this direction of verdict the plaintiff took exceptions. In addition to the exceptions taken to the directed verdict, the plaintiff preserved and perfected exceptions to the admission and refusal to admit evidence. These exceptions are six in number.

EXCEPTIONS TO DIRECTION OF VERDICT FOR DEFENDANT

The plaintiff, Ralph B. Sanborn, owns and operates a turkey farm and in the Spring of 1954 was in the process of raising approximately ten thousand turkeys. He was under a turkey feed contract with the defendant corporation whereby he agreed to use defendant's feed to the exclusion of all other commercial feeds. The plaintiff testified he followed the recommendations made by the representatives of the feed company and used the type of feed characterized "Elmore Turkey Starting Mash" which contained sulfa quinoxaline in its formula. This is the kind of feed that plaintiff alleges did damage to his flock because of its high content of sulfa quinoxaline. On June 1, 1954 Mr. Sanborn ordered from the Elmore Mills a shipment of this feed consisting of 183 100 lb. bags. The feed was given to the young poults as a starting mash. The birds fed on this mash ranged from three days to six weeks old. Mr. Sanborn said that on the second day after giving the feed to the birds he noticed their reactions were not normal. There followed illness, some of the birds dying and others losing weight. Loss of 1701 turkeys occurred over a period of five days. The plaintiff further claims, according to his testimony, that the surviving birds, approximately eight thousand in number, were retarded in growth. This retardation caused a longer period to elapse before the birds arrived at that state of physical condition which would meet marketing requirements. The birds were not ready for sale for the Thanks-

giving and Christmas business of that year which represented a financial loss to Mr. Sanborn.

Counsel for the defendant argues that the presiding justice was without error in directing a verdict for the defendant. His argument is twofold: (1) that the plaintiff's turkeys could not have died as a result of the feed furnished by defendant because the testimony shows the deaths occurred from June 6th to June 10, 1954, and that the plaintiff was not in the possession of the feed until June 8, 1954; (2) the testimony of defendant's expert in poultry nutrition conclusively proved that if the poults had been fed feed containing an amount of sulfa quinoxaline ninety times greater than the recommended quantity it would not cause the death and retardation of growth of the birds as plaintiff claims.

Defense counsel urges that plaintiff's own testimony, if taken at its face value, shows death of the birds previous to receipt and use of the feed. According to one of defendant's exhibits designated "delivery receipt" and bearing the signature of Ralph Sanborn as consignee, there is documentary evidence that feed was received on June 7, 1954 at Sebago Lake by Mr. Sanborn. Another exhibit dated June 6, 1954 and June 10, 1954 shows a loss of 1701 turkeys varying in age from one to seven weeks.

Concerning the element of time, the record demonstrates some discrepancies between the plaintiff's testimony and some documentary evidence presented by himself and by the defendant.

Counsel argues the inference to be drawn from such discrepancies is that the death of the poultry could not have occurred as a result of the consumption of defendant's product. It must be remembered, however, that all of the feed given to these turkeys was supplied by the defendant under terms of the written contract.

The plaintiff claims, in addition to the death of the birds, some eight thousand of them were retarded in growth because of the high content of sulfa quinoxaline contained in the feed. In this·instance the problem of time, between when the feed was received and its alleged ill effects took place, is not so important. There is ample evidence in the record showing receipt of the feed by the plaintiff and that in a week's time after its receipt the plaintiff fed 110 bags of the feed to his birds. There is further evidence that the plaintiff sent samples taken from this questionable shipment to the University of Maine for analysis.

*Barrett* v. *Greenall*, 139 Me. 75, at page 80:

> "The issue here is not whether the evidence adduced is sufficient to establish the controverted facts, but whether or not it has a tendency to establish those facts, and if this is so, although 'it may not be strong in its support, and the Judge may well apprehend, that the jury will find it insufficient,' the Court has no 'right to weigh it, and determine its insufficiency as matter of law.' **** It is the province of the jury, and not of the justice presiding in the Trial Court, to judge of the testimony of the witnesses appearing in the cause and to weigh their evidence *******. The credit to which the testimony of a witness is entitled is entirely a question of fact for decision by the jury."

A presiding justice may order a directed verdict in a civil case when a contrary verdict could not be sustained on the evidence presented. *Johnson* v. *Portland Terminal Company*, 131 Me. 311; *Coleman* v. *Lord*, et al., 96 Me. 192; *Bennett* v. *Talbot*, 90 Me. 229.

The defendant urges consideration of the testimony of its expert in poultry nutrition, arguing that according to his expert opinion the sulfa quinoxaline content in the defendant's feed in no way caused the death of the turkeys or retarded the growth of the turkey flock. It is suggested

that the testimony of this expert, in giving his opinion that the sulfa quinoxaline content was not the cause of the death or retardation of growth, was sufficient to justify the directing of a verdict favoring the defendant. This position is not legally tenable. The record discloses the fact that the plaintiff in support of his case used the testimony of a witness who was head of the department of animal pathology at the University of Maine. A great percentage of his work at the University was concerned with poultry pathology. There appears to be no overall objection to his testimony. He expresses the opinion that the amount of sulfa quinoxaline contained in the feed given to plaintiff's birds could result in death and retardation of growth. The defendant, on the other hand, presents an expert in poultry food nutrition whose testimony is in direct contradiction to that of plaintiff's expert. The jury were, therefore, presented with a factual question as to which opinion, if either, they would accept. Expert testimony is to be treated in the same manner as any other testimony by the triers of fact. It is subjected to the same tests as to weight and probative value as non-expert testimony.

23 C. J. S., Criminal Law, Sec. 891:

"Expert testimony is to be weighed and judged like any other, and the same tests are to be applied thereto. It is not necessarily conclusive or controlling, even when uncontradicted by the testimony of other experts, but its weight and value are to be determined by the jury who should consider it in connection with all the other evidence in the case ****** ."

20 Am. Jur., Evidence, Sec. 1208.

A very careful examination of the record in this case has been made with a view of determining if there is sufficient evidence, if believed by the jury, to warrant a verdict in favor of the plaintiff. *Johnson, et al.* v. *The New York, New*

*Haven and Hartford Railroad, et al.,* 111 Me. 263, at page 265:

> "****** if there was evidence which the jury were warranted in believing, and upon the basis of which honest and fair minded men might reasonably have decided in favor of the plaintiffs, then the exceptions must be sustained. In such a case it is reversible error to take the issue from the jury."

The evidence, as contained in the record, is such as to require jury consideration; consequently, the exceptions to the directed verdict must be sustained.

The sustaining of the exceptions to the directed verdict removes the necessity of considering the other exceptions.

*Exceptions to directed verdict sustained.*