(117 So. 565)

No. 26973.

**BERNARD v. FRANCEZ.**

May 7, 1928. Rehearing Denied June 4, 1928.

Mouton & De Baillon, of Lafayette, for appellant.

St. Julien & Fournet, of Lafayette, and Burke & Smith, of New Iberia, for appellee.

THOMPSON, J. The defendant and his wife, Philomene Bernard, June 30, 1906, executed a reciprocal last will and testament, by which one bequeathed to the other all of the property which he or she possessed at the time of his or her death.

The wills were by separate instruments, and were executed before a notary public in the presence of the required number of witnesses.

Mrs. Bernard died on February 16, 1919, without issue, leaving as the only collateral heir, a sister, who is the plaintiff in this suit.

On February 26th the surviving husband presented the will of his wife for probate, and caused a rule to issue to his wife's sister to show cause why he should not be confirmed as universal legatee and testamentary executor of the will.

Service of this petition was accepted, all delays waived, an answer filed, and judgment rendered probating the will.

Thereafter, the universal legatee was sent into possession of all the property of the estate.

The present suit is brought by the sister of the testatrix to annul the will on two grounds: (1) That the will was not dictated by the testatrix and written by the notary as dictated in the presence of the witnesses, and (2) that there was an interruption in the making of the will, and a turning aside to another act in this, that the said purported will of the said Philomene Bernard and the said purported will of Gaston Francez were read by said notary to said parties in the presence of said witnesses before the completion of either by the signatures of said parties, or either of them, and by said witnesses and said notary; and said pretended testament of Philomene Bernard was only signed by her, the said witnesses, and the notary, after said interruption.

An exception or plea of res judicata and a plea of estoppel were filed, and, after a hearing thereon, were overruled.

The case was then put at issue, and, after hearing and considering the testimony of a number of witnesses, the judge rejected plaintiff's demand and maintained the validity of the will.

The transcript comprises 416 typewritten pages, and the original and supplemental briefs filed in the case cover 500 printed pages, the greater part of which is devoted to a discussion of the pleas of estoppel and res judicata and authorities relative thereto.

The conclusion we have reached renders it unnecessary to consider these pleas, so we come directly to the case on the merits.

All of the formalities required by law for the validity of a nuncupative will by public act appear on the face of the will to have been literally and scrupulously observed.

The will therefore makes full proof of what it contains and of the facts therein recited, until and unless it is shown to be false, forged, or counterfeited by competent and satisfactory testimony.

The plaintiff, to sustain the charge of nullity propounded against the will, relies on two of the three witnesses who attested the making of the will, the third witness being dead at the time of the trial, and on the testimony of a typewriter mechanic and an expert on long handwriting to corroborate the charge that there was an interruption, or turning aside, before the will was completed.

One of the witnesses to the will, Don Louis Herpin, 67 years old, testified substantially to the effect:

That he was called to be a witness to the making of the will. That he was not sure if the paper was written or not when he went in. He remembered that Judge Campbell read the act, and both Mr. and Mrs. Francez answered that was the will they wanted.

That the notary read the two wills, one after the other, and when asked if he could swear positively that the judge (meaning the notary) did not write the will under dictation, the witness answered that he could not; that he did not remember if he did or not. When asked if he remembered whether the notary public got through with one of the wills before taking the other, the witness answered:

"I don't remember. One thing I can remember was that he read those wills to us.
"Q. You can't swear that one will was not completed before the other was taken up? A. No, sir."

The witness, having in answer to one counsel stated that the two wills were written and signed one after the other, and to the opposing counsel that he did not remember and could not swear positively that the notary did or did not write the wills in his presence, was asked, in an effort to reconcile his conflicting answers, to explain what he meant

and to give a correct and positive answer, and this is what he said, quoting:

"Well, when the judge read one of the wills and he asked Mrs. Gaston if that was her will and she answered yes, and then he took the other will and read it to Mr. Gaston and asked him the same question, and he answered that it was; that is exactly what I can remember; that is a good while ago. When he got through reading the wills, we signed them."

Still further in his testimony, the witness repeated and reiterated what he had said before, that it had been so long he would not like to swear one way or the other.

The testimony of this witness therefore, when considered as a whole, possesses very little probative effect, for, after all is said, about the only thing he could remember was that the two wills were read, one after the other and then signed, one after the other, but on account of the long lapse of time he would not be willing to swear that the wills were not written at the time as dictated, and one read and signed up before taking the other one up.

The other witness for the plaintiff was J. Horace Mouton, and his testimony is equally as equivocal and uncertain as that of Herpin.

He testified:

That he was in Judge Campbell's office when Mr. and Mrs. Francez came in. That Judge Campbell asked if they had come to make their wills, and he started to get his hat and leave when Judge Campbell asked him to remain to be a witness. That Gaston, at the suggestion of Judge Campbell, went out and got the other two witnesses. That when they came in, Judge Campbell went to his desk and pulled out the testament and read it, and then asked them if they understood it. That Mrs. Francez stated that she wanted to give her property to her husband, and at his death, to go to her folks or parents.

That the judge explained to her that such a will would be null and void.

That she then said she would accept the will as presented. That the will was then read over again, and was given to Mrs. Bernard to sign, and then to Francez, after which the witness signed. That there was but one will, and it gave the property one to the other.

When presented with the two wills, the witness acknowledged that he had signed both of them as a witness, and was astute enough to avoid the suggestion that his mistake was possibly due to a faulty recollection by saying that what he meant by stating there was one will was that the wills were mutual, one to the other.

When asked if Judge Campbell wrote the two wills on a typewriter on the day before he read them, the witness answered that he did not remember, but that he would not swear that Judge Campbell did not write the wills on the typewriter at the time. He said that it was possible, after 17 years, for him to make an error.

Again, when asked if it was not possible for Judge Campbell to have typewritten the will in witness' presence and that of the other parties present, and that witness had forgotten about it, the witness answered that it could have been done, but that he did not remember.

Again, when asked if it was not possible that Mrs. Bernard dictated the will to the judge in the presence of the witnesses and that he had forgotten it, the witness once more answered that he did not remember.

Seventeen years had elapsed since the making of the wills when these witnesses were called to testify, and it is perfectly natural for many of the important events in connection with the making of the wills to have faded from their memory, but it does seem significant that the two witnesses could remember that the two wills were read, one following the other, and thereafter signed, and yet could not remember equally as important events connected with the making of

the will, among which was whether the parties had dictated the wills, and whether Judge Campbell had then and there taken down the dictation on his typewriter.

There is no satisfactory explanation offered why the witnesses should so readily remember the circumstances to which they testified, and yet have no recollection whatever on the other matters inquired about, which were of equal importance and significance.

The testimony of the two witnesses is so confusing and their recollection is so hazy, indefinite, and uncertain that a court would not be justified in setting aside the will in question, even if there was no evidence to the contrary.

█ The rule of jurisprudence is that, to set aside a will of this character, the proof of noncompliance with the essentials as recited in the notarial act must be peculiarly strong to overcome the presumption in favor of the will, and the testimony of the witnesses themselves who have given their solemn attestation to the compliance of the required formalities is entitled to little weight.

This court said in Succession of Beattie, 163 La. 831, 112 So. 805:

"Testimony of subscribing witnesses which is adduced on the contest of the will and which, in effect, impeaches the solemn statements contained in the instrument which by their signatures they have attested as correct, is not in itself sufficient to overcome the presumption of validity arising from their presence and signatures and the official certificate of a public officer fortified by his oath.

"Their testimony must be corroborated by independent facts or reasonable inferences."

See, also, Major v. Esneault, 7 La. Ann. 52; Succession of Young, 11 La. Ann. 65; Starrs v. Mason, 32 La. Ann. 9; Succession of Cauvien, 46 La. Ann. 1412, 16 So. 309.

Counsel criticize the doctrine announced in the Beattie Case as being without precedent, and they declare that such a principle is fraught with latent dangers of fraud on the rights of a testator to dispose of his property.

But there would be room for greater fraud on the right of the testator to dispose of his property and on the rights of the legatees if the principle contended for by counsel should be recognized—that is, to permit subscribing witnesses to deny their own solemn act and to break down the solemn authentic act of a sworn officer.

As said in the Beattie Case:

"Otherwise * * * testators would be at the mercy of defective memories and uncertain minds, to say nothing of venal callousness that for a consideration or other improper motive might choose to modify or erase a record when time may have already written the impossibility of remedying the consequences of the nullity."

The testimony of the two attesting witnesses in the instant case is not only not *peculiarly strong* and convincing, but it is not even persuasive in the slightest degree.

██ The will was written by the notary on a typewriter, and to support the contention that the making of the will was not one continuous act, the plaintiff was able to produce two witnesses, one a typewriter mechanical expert and the other an expert on writing in longhand, who were willing to testify, and did testify, that the will itself, on its face, bore unmistakable evidence that part of it was written at one time and a part at a different time.

The opinions of the two witnesses were based on the fact that the line containing the names of the three witnesses, at the beginning of the will, was not parallel with and of equal distance from the line above and the line below, and that the names of the witnesses were not vertical with respect to the preceding and subsequent line. And that the same thing occurs at the close of the will, all of that part after the words "Thus done," etc., containing two lines, being out of line horizontally and vertically from the preceding line. The two experts concede, however, that all of the will was written continuously from the beginning of the will down to the

end of the line third from the last, but that the names of the witnesses on the third line, as well as the two last lines beginning with the word "thus," were written at a different or subsequent time. From this it is argued with apparent seriousness that the notary prepared the will in advance of the day of its signing and left blank spaces for the insertion of the names of the witnesses and for the closing.

There is a very slight difference to be observed in the space between the line containing the names of the witnesses and the lines preceding and succeeding, and a little more marked difference in the space at the close of the will between the line ending with the word "act" and the line beginning with the word "thus," but we cannot attach the importance and significance to this slight deviation or malalignment that the plaintiff and her expert witnesses do.

It is a matter of common knowledge that typewriters, after use for some time develop defects, and not infrequently there appear purely accidental variations in alignment.

One of the authorities quoted by counsel states as patent the fact, which is well recognized, that typewriting machines develop, by use, some defects or irregularities in the alignment or position of its type or in other features.

Judge Campbell, the notary before whom the will was executed, testified that he was not an expert on the typewriter; that his typewriter had a space lever and a ratchet spring, but that he never used the space lever, spacing his machine by revolving the thumb wheel. This method, it is admitted, often brings about irregularities in the work, and, not unlikely, both horizontal and vertical.

The effort to annul a solemn act of last will and testament, clothed with all of the formalities required by law, on proof that in one or two instances the typewritten lines of the will are out of alignment slightly, introduces a novel procedure in the jurisprudence of this state, and one that we are not at this time prepared to recognize. Since a will written on a typewriter is held to be valid in this state, instances may arise in which a will so prepared may be established to be false, forged, or counterfeited, and to present not a true record of what actually occurred at the making of the will, but it would require something more than the fact that in two instances the lines were not parallel, and something more than the opinion of two experts to establish that the will was written at different times.

The notary public and the defendant each testified to the verity and truthfulness of the recitals of the will, and that the wills were written down on the typewriter at the dictation of the testatrix and testator in the presence of the three witnesses and read in their presence before being signed, and that one will was so prepared, read, and signed before the other.

We have examined a number of cases where attacks have been made on nuncupative wills by public act on the ground that such wills were not dictated and taken down by the notary in the presence of the witnesses as recited in the wills, but we have not been able to find any case where the attack was less justified and less supported by the testimony than the attack here made.

We are not impressed with the attack made upon the late Judge Campbell, who prepared the will in question.

Judge Campbell was a reputable member of the bar, had served the state in several official capacities, and, we believe, served on the bench for 16 years.

It is inconceivable that Judge Campbell, with his knowledge of the essentials to constitute a valid will, would have deliberately prepared and had executed the wills in question in utter violation of those legal requirements.

And much less can we be persuaded to believe. that he would have sworn falsely .in order to uphold the validity of his act.

For reasons assigned, the judgment appealed from is affirmed with costs.

O'NIELL, C. J., takes no part.