HAWTHORNE, Justice.
Mrs. Catherine Talluto, widow of Joseph Spatafora, died in New Orleans in June, 1955. She left a nuncupative will by public act dated March 11, 1954, in, which she bequeathed real and personal property to her brother, her sister, and several nieces and nephews. Her estate had an inventoried value of over $85,000.
The brother of the deceased and some of her nieces and nephews instituted this suit to have the will declared null and void. The attack on the will is twofold: . (1) That the testatrix at the time of the execution of the will did not possess testamentary capacity because she was mentally incapable of making a valid will,, and (2) that certain formalities required'1in the execution of a nuncupative will by public act were not complied with because there was an interruption and turning aside to other acts during the execution of the will. The prayer was that the will be decreed void and that petitioners and Mrs. Spatafora’s sister be recognized as the sole heirs at law of the deceased and as such entitled to her property. The case was tried on its merits, and the lower court rendered judgment dismissing plaintiffs’ suit. They have appealed.
This appeal presents two issues of fact. The first is whether the testatrix possessed testamentary capacity on March 11, 1954, and the second is whether all the formalities required by law for the making of a nuncupative will by public act were complied with.
Under the law there is a presumption that a testator possessed testamentary capacity, and the persons attacking the will have the burden of showing lack of this capacity when the will was made. The test of testamentary capacity is the ability of the testator to comprehend the condition of his property and his relation to those who may naturally expect to receive it after his death. Succession of Prejean, 224 La. 921, 71 So.2d 328; Succession of Moody, 227 La. 609, 80 So.2d 93; Succession of Lafferanderie, 228 La. 871, 84 So.2d 442.
In the record before us in this case we have the testimony of both lay and medical witnesses about Mrs. Spatafora’s state of mind for' the 21-year period from 1934 until her death in 1955. The evidence of the lay witnesses, who were for the most part relatives of Mrs. Spatafora by blood or marriage, is so conflicting that it is not of much value. Fortunately, however, there is reliable and impressive medical evidence by qualified psychiatrists which is quite sufficient to resolve the question whether the deceased possessed testamentary capacity at the time of making the will.
It was brought out during the trial of the case that in 1934 Mrs. Spatafora spent approximately three months in De Paul Hospital, a hospital in New Orleans for emotionally and mentally disturbed persons, at which time she was treated by a psychiatrist, Dr. H. Randolph Unsworth, for depression apparently induced by the menopause; that in 1953, when she was 67 years old, she became depressed during the illness of her husband and spent two months under Dr. Unsworth’s care in Southern Baptist Hospital, where she received shock treatments in an attempt to alleviate her depression; and that in March, 1955, one year after the making of the will here under attack, an interdiction proceeding was brought against Mrs. Spatafora by many, or all, of the relatives who are here seeking to overthrow her will.
Throughout the trial of this case counsel for petitioners stressed the various illnesses which beset the testatrix from 1934 on — such as broken rib, cancer of the left breast and of the uterus necessitating a mammectomy and a partial hysterectomy, broken wrist, fever, chills, bronchitis, inflamed gall bladder and gall stones, and uremia — , and counsel argues that so many ills must have affected her mind. It seems reasonable to conclude that the many ill *429 nesses from which she suffered caused Mrs. Spatafora to be very depressed and disturbed at certain periods of her life, but the question here is whether she possessed testamentary capacity when the will was made.
The really crucial evidence on Mrs. Spatafora’s capacity to make a will on March 11, 1954, is given by Dr. H. Randolph Unsworth, the psychiatrist who treated her off and on for the last 21 years of her life, and who was called as a witness by the parties attacking the will, and by two other psychiatrists who examined her during that time — Dr. C. P. May, who saw Mrs. Spatafora professionally in connection with the interdiction proceeding in April, 1955, and Dr. Kenneth August Ritler, who examined her the following month at the request of the notary before whom the will was executed.
As mentioned above, Dr. Unsworth began treating Mrs. Spatafora for a depressive illness in 1934, when she was 48 years old. He testified that although at that time the deceased was depressed, agitated, self-depreciatory, and subject to insomnia, she showed no evidence during the hospital period of having a psychosis; that she was always in touch with reality, and that she could have taken care of any business situation which arose. In regard to her stay in Baptist Hospital in 1953, Dr. Unsworth stated that she had been found at that time to be suffering from arteriosclerosis; that because of her deep depression she received electrical shock treatments, which are invariably associated with forgetfulness and a state of confusion for several months following the treatments; that although Mrs. Spatafora was depressed at this time, she was in touch with reality and showed no evidence of psychosis. During the period between her discharge from Baptist Hospital in May, 1953, and the making of her will in March, 1954, Mrs. Spatafora paid several visits to Dr. Unsworth’s office. On June 17, 1953, a month after she left the hospital, she was oriented in all spheres, had no mental confusion, and showed no evidence of delusions or hallucinations, and although she was still moderately depressed, she was cooperative and took care of her business affairs, such as rent checks and bank deposits. Her next visit to Dr. Uns-worth was on March 7, 1954, just four days before the will was made. In describing the state of his patient’s health on that date the psychiatrist said:
“And her physical health was good and psychically she was oriented in all spheres and she had no mental confusion and I discussed with her the awareness of her properties, of her assistance to Mrs. Rao in her checking account, her rental, her deposits, and I found that she knew of errors in certain tabulations which were made in her bank deposits and called attention to that effect; she knew what tenants were delinquent in their rent in that they would pay half of it we will say, and she was aware of the fact they owed her the other half.”
When asked by the court whether in his opinion Mrs. Spatafora was capable of making a will, Dr. Unsworth replied: “Completely. At no time did I think she was incompetent or lacked testamentary capacity.”
Dr. C. P. May, a witness for the defendants, had been appointed by Judge Alexander Rainold, along with another psychiatrist, Dr. John W. Bick, in the interdiction proceedings, to make a psychiatric examination of Mrs. Spatafora and to report the results of that examination to the court. Dr. May, with Dr. Bick, first examined Mrs. Spatafora on April 30, 1955. That examination lasted about an hour and a half, and no delusions or hallucinations were found. With Dr. Gene Usdin, also a psychiatrist, Dr. May made another examination on May 7, 1955. Drs. May, Bick, and Usdin were in complete accord in their findings that Mrs. Spatafora “had no delusions or hallucinations or mental deterioration”. She showed some apathy, fatigue, lassitude, and *430 depression; the depression had the effect of slowing down her mental faculties, but she had no confusion and no evidence of a major psychosis. Dr. May explained that major psychoses are “the psychoses that get people completely out of touch with reality so that they don’t know what they are doing and usually they are declared insane as a result of that”.
The interdiction suit was either discontinued or dismissed. Dr. Bick did not testify at the present trial because of illness, and Dr. Usdin was not called by petitioners.
Dr. Kenneth August Ritler, another psychiatrist called by the defendants, examined Mrs. Spatafora at her home on May 13, 1955, at the request of the notary present at the making of the will in March, 1954. Dr. Ritler said she was depressed, her thinking was retarded or slowed up, and she gave monosyllabic answers, but she was perfectly oriented as to time, place, and persons, and her memory and intelligence were good. Dr. Ritler was of the opinion that she had an affective disorder and mood disturbance, but that this illness had left unaffected her intelligence and her capacity to perceive, grasp, and understand, and that she was capable of caring for her person and her property. He stated that at the time he examined her in his opinion “her testamentary capacity was intact”.
Petitioners, the opponents of the will, called two well-qualified psychiatrists, Dr. Robert M. Gilliland and Dr. William C. Thompson. Neither of these doctors had ever seen the deceased, and their testimony was therefore confined to answering hypothetical questions. Their evidence is unimpressive, especially in the light of the positive evidence by psychiatrists who had treated or examined Mrs. Spatafora.
One of the witnesses to Mrs. Spata-fora’s will testified for petitioners on the' question of the deceased’s testamentary capacity. This testimony is not impressive, and cannot be considered authority for the conclusion that at the time the testatrix made the will she lacked testamentary capacity.
We conclude, as did the trial judge, that petitioners have not proved that Mrs. Spatafora lacked testamentary capacity on March 11, 1954, when she made her last will. On the contrary, the evidence in this suit shows that in spite of recurring periods of depression the testatrix at all times understood the condition of her property and her relation to those who expected to receive it after her death.
Accordingly petitioners have failed to sustain their first attack on the will.
The second ground of attack on Mrs. Spatafora’s will is, as already stated, that all the formalities required by law for the making of a nuncupative will by public act were not complied with.
Article 1578 of the Louisiana Civil Code ■requires that the nuncupative will by public act be received by a notary in the presence of three witnesses residing in the place where the will is executed, or five witnesses not residing there; that the testament must be dictated by the testator and written by the notary as it is dictated; that it must then be read to the testator in the presence of the witnesses; and that express mention “is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption, and without turning aside to other acts”.
It was said in Bernard v. Francez, 166 La. 487, 117 So. 565:
“All of the formalities required by law for the validity of a nuncupative will by public act appear on the face of the will to have been literally and scrupulously observed.
“The will therefore makes full proof of what it contains and of the facts therein recited, until and unless it is shown to be false, forged, or counterfeited by competent and satisfactory testimony.”
*431 In the instant case petitioners contend that Mrs. Spatafora’s will is invalid because it does not satisfy the requirements of Article 1578. The basis of this contention is the allegation that the testatrix held conversations with her sister in a foreign language, and that some of the witnesses talked among themselves. However, the only evidence that the testatrix talked to her sister in a foreign language and that two of the witnesses talked on matters unconnected with the will was furnished by the other witness to the will. This witness testified that the sister was in the room when the will was made, but the notary and other persons in the room at that time deny this, as do the sister and her son. The notary, the other witness to the will (the third witness had died), the sister, her husband, and her son all swore that the sister was not in the room while the will was being made, and the notary, the witness, and th.e brother-in-law testified that there was no conversation in the room once the actual making of the will had begun. In view of this strong evidence, the legal presumption that the recitals of a nuncupative will by public act must be considered as proved until disproved (Renfrow v. McCain, 185 La. 135, 168 So. 753), the unimpressive testimony that two of the subscribing witnesses were talking on subjects unrelated to the will, and the case of Bernard v. Francez, supra, we must conclude that petitioners have failed to prove their allegations on this point. In Bernard v. Francez this court expressed little enthusiasm for the testimony of subscribing witnesses who deny their own solemn act and attack a will that they witnessed. There this court said:
“The rule of jurisprudence is that, to set aside a will of this character, the proof of noncompliance with the essentials as recited in the notarial act must be peculiarly strong to overcome the presumption in favor of the will, and the testimony of the witnesses themselves who have given their solemn attestation to the compliance of the required formalities is entitled to little weight.”
Thus the second attack on the will, like the first one, has not been maintained.
The judgment is therefore affirmed at appellants’ costs.
HAMITER, J., did not participate.