**LOVICH, Plaintiff-Appellee, v SALVATION ARMY INC., Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20610. Decided June 30, 1947.

Harrison, Thomas, Spangenberg & Hull, Cleveland, for plaintiff-appellee.

McKeehan, Merrick, Arter & Stewart, Cleveland, for defendant-appellant.

## OPINION

By HURD, PJ.

In this action originating in the Court of Common Pleas of Cuyahoga County, now before this Court on appeal on ques- of law, a recovery was had by plaintiff in the sum of $2,000.00 against the defendant, the Salvation Army Inc., for personal injuries and illness as the result of an attack of typhoid fever suffered while the plaintiff was a resident of a home for working girls known as "Evangeline Residence" conducted by the

Salvation Army. The case was tried on a second amended petition containing the following specifications:

"Plaintiff says that at the time herein referred to the defendant was reckless and negligent in the following respects to-wit: * * *

(3) In serving to the plaintiff, food and drink which was contaminated with typhoid infection.

(4) In serving food and drink which was unwholesome and infected and was prepared, served and sold in violation of the so-called pure food laws of Ohio. * * * *

(7) In providing impure, infected and dangerous food and drink for plaintiff in violation and breach of its promise and/or implied warranty that the food provided, served and sold in said restaurant would be fit for human consumption and free from dangerous or harmful infections or bacterial contamination.

As a direct result of the negligent acts hereinbefore set forth, and of the breach of the implied warranty that the food served and sold would be fit for human consumption and free from impure substances and bacterial contamination, the plaintiff became infected with typhoid bacilli, was rendered seriously ill * * . * ."

Contained in the answer are allegations of defendant that it is incorporated as a religious and charitable organization not for profit and that the plaintiff was a beneficiary of its charity. Defendant denied generally any negligence on its part and denied specifically that it was negligent or careless in the employment of a person to serve food who was a typhoid germ carrier as alleged in the amended petition.

A number of errors are assigned but the principal errors claimed are: (1) That the Common Pleas Court erred in instructing the jury to return a verdict for plaintiff appellee and in submitting to the jury only one form of verdict, namely, a verdict for plaintiff appellee; (2) That the Common Pleas Court erred in overruling defendant appellant's motion for judgment at the close of all the evidence.

We shall consider these assignments of error in the order named.

There was evidence that plaintiff was one of 350 young women residing in the home and one of the 18 sufferers in the typhoid fever epidemic that broke out in the home in January, 1944.

The evidence bearing on the issue of the cause of the illness of plaintiff and other sufferers was the testimony of one Dr. Theo. G. Duncan, Chief of the Subdivision of Communicable Diseases of the Division of Health of the City of Cleveland, who testified that an epidemiological survey was made under his direction. He described the measures taken to ascertain the source of infection which resulted in the identification of one Martha Brown as a typhoid carrier, who was in the employ of defendant in the kitchen, having been hired September 14, 1943. This identification was made after a series of microscopic tests. Concerning Martha Brown, Dr. Duncan testified in part as follows:

"Q. Did your investigation reveal what the nature of her work was at the Evangeline Home?

A. Yes.

Q. What was it?

A. As I remember she washed dishes. As I recall she went to work there about the 13th of September 1943 and her duties as I remember from what I got from the hospital, through the institution and herself, she was just simply a dishwasher up until a certain date in December, when she was given an additional job of making orange juice. That was about the 15 of December, some other employee was taken out of there for some reason and she had an additional job, which I learned later; I didn't find that out at first.

Q. Did you find that she then, since she had started making the orange juice, continued at that until she left the employment?

A. Her history was that for about ten days she had the full responsibility in the morning of making the orange juice, and then she was given some help; she didn't like it, she said the work was too hard for her, and she left. When I heard about this was on the 16 of January and I found her at home.

\* \* \* \*

Q. Coming back to Martha Brown, did you run a similar stool test on her?

A. Yes, we took three; we took two at her home and both of them were positive, and she had no temperature, showed no illness whatsoever for several days, and I took her to the hospital and we took three or four other cultures and they were all positive for typhoid organism.

Q. Assuming, Doctor, that Martha Brown did prepare the orange juice subsequent to the 15 of December, 1943 for a time doing it herself without any help and for a time was assisted

by someone else, and that continued up through the middle of January of 1944.

A. That's right.

Q. Assume further, that all 18 girls who later contracted typhoid fever as you have described their cases to us, included orange juice as part of their breakfast during this period from and after the 15 of December, 1943; assuming that they then contracted the disease on or about the dates that you have indicated, within the range that you have indicated; now assuming those facts and further, doctor, that you found the plumbing and water supply at this residence was quite all right and showed no typhoid source contamination; assuming all those factors, doctor, do you have an opinion—and assuming furthermore, that you made an investigation of the food handlers that worked at the Evangeline Home during the period subsequent to the 1st of November, 1943, and that your investigations showed you that only one of those food handlers was a typhoid carrier, and further, that that carrier was Martha Brown, who had assisted in the preparation of the orange juice as described before; assuming all those facts, doctor, and assuming finally the fact that you determined positively that she was a typhoid carrier, will you please tell us whether or not you have an opinion as to the cause of the typhoid fever that these 18 persons contracted? Do you have an opinion, doctor?

A. I have an opinion.

Q. All right, please tell the jury what that is.

A. The opinion is that this girl, who was harboring the organism typhoid fever, which was definitely proved by laboratory tests, was able to contaminate food or drinks that some of these individuals ate or drank, and in that way typhoid is spread by hand to mouth. In other words, you contaminate something that somebody else takes, and the reason we felt she did not contaminate more, it was just when she squeezed the orange squeezer, she probably contaminted it with some of the contamination on her hands, and the first one that got the orange juice got the organism from her hands, some of them got a certain amount, and it is our reason for believing it only affected a certain number, it washed off her hands.

Q. Do you believe, then, doctor, that the orange juice those girls drank was the source of the contamination?

A. I do.

Q. And do you believe that the contamination was the presence of typhoid bacilli in the orange juice?

A. I do.

*   *   *   *   *   *   *   ''

The foregoing testimony is the only direct evidence in the record in respect of the cause of the epidemic. A careful analysis thereof dicloses, (1) that the doctor expounds a theory developed by him, based upon his investigations conducted after the outbreak of the epidemic, and (2) an opinion expressed upon an assumed hypothesis.

It will be noted that while the hypothesis excluded the plumbing and water supply, other hypotheses are not excluded such as possible contacts of one or more of the residents with persons infected with the disease outside of the home. We think it is a matter of common knowledge that typhoid may be communicated by personal contact.

It is well settled in Ohio that expert testimony may be received by the court to assist the jury in arriving at a just and correct verdict. Insofar as such testimony aids the members of the jury in their deliberations it should be used.

However, the members of the jury are the sole judges as to what weight the opinion of the expert is entitled to receive at their hands and should be instructed to give such testimony just such weight as they in their judgment deem it entitled to receive.

With respect to hypothetical questions, the opinion of experts based upon facts assumed are of no value unless the assumed facts forming the basis of such opinions are supported by the evidence and are true, and if the jury finds that the assumptions are not true, then they should disregard the answers to such questions. Such opinion evidence is but to supplement and not to supplant the judgment of the jury. There is a wide difference between unrebutted factual evidence and unrebutted opinion evidence, and in the instant case the court did not permit the jury, under proper instructions, to consider this evidence but instead directed a verdict for the plaintiff.

An issue was made by the testimony of the expert on the question of whether or not the orange juice prepared by Martha Brown, if it was prepared by her, was the source of the infection. An issue was also made as to whether or not the Evangeline Residence served contaminated food, as to whether or not such serving was the proximate cause of the illness of the defendant. The burden of proof was upon the plaintiff to prove by a preponderance of evidence the essential allegations of her petition and questions of fact were presented upon which reasonable minds might reasonably reach different conclusions.

On a review of the entire record and particularly upon consideration of the testimony of the expert witness, we are of the opinion that the trial court erred in concluding **as a matter of law** that the sole source of the infection was the preparation of food by Martha Brown.

As was heretofore stated, neither the court nor the jury were required to accept the theory of the opinion of the expert witness as conclusive of the issues of fact raised by the pleadings and the evidence.

Bahl v Byal, et al, 90 Oh St 129.

Ohio & Indiana Torpedo Co. v Fishburn, 61 Oh St 608.

Haas et al v Kuntz, 94 Oh St 238.

Manley v Coleman, 19 Oh Ap 284.

Dime Savings Bank v Norton, 8 N. P. 422; 25 Oh Ap 157.

Stith v Indus. Comm., 12 OLR 439.

See also: Hampden Lodge etc et al, v Ohio Fuel & Gas Co., 127 Oh St 469, and the long line of Ohio cases following this rule.

There is one other question presented by this record which makes it unnecessary to dwell at greater length on the action of the court in directing the jury to find for plaintiff, other than to conclude that such action on the part of the court constituted prejudicial error.

We think that the trial court was correct in its conclusion that it was conclusively established that the defendant was a charity and that its operation of the Evangeline Residence was a charitable enterprise, and that the plaintiff was a beneficiary of the charity. There is no evidence in the record tending to show the failure on the part of the officers or those in charge of and managing and directing the operation of the Evangeline Residence of the Salvation Army to exercise due care in the selection or retention of any of its employees, including Martha Brown.

These facts bring the instant case squarely within the rule laid down by the supreme court in the cases of Cullen v Schmit, 139 Oh St 194, 39 N. E. Rep. (2d) 146; Taylor v Flower Deaconess Home and Hospital, 104 Oh St 61; and Sisters of Charity v Duvelius, 123 Oh St 52. At page 196 of the case of Cullen v Schmit, the court states the rule as follows:

"In conformity with the general rule this court has held that a charitable or eleemosynary institution is not liable for tortious injury except (1) when the injured person is not a beneficiary of the institution, and (2) where a beneficiary suffers harm as a result of failure on the part of the authorities

of the institution to exercise due care in the selection or retention of an employee. Taylor v Flower Deaconess Home & Hospital, 104 Oh St 61, 135 N. E. 287, 23 A. L. R. 900; Rudy v Lakeside Hospital, 115 Oh St 539, 155 N. E. 126; Sisters of Charity v Duvelius, 123 Oh St 52, 173 N. E. 737; Lakeside Hospital v Kovar Admr., 131 Oh St 333, 2 N. E. (2d) 857; Waddell, a minor, v Y. W. C. A., 133 Oh St 601, 15 N. E. (2d) 140; 10 Am. Jur. 687 and 691, §§140 and 144; 14 C. J. S. 548, §75."

It appears that the trial court held that since there was no negligence shown in the employment of any of its servants that the defendant could not be held responsible in damages on the theory of negligence. This conclusion was in accordance with well established principles of law. However the trial court held that the serving of contaminated food to plaintiff was a breach of an implied contract of sale of food and that since a charitable institution is liable on its contracts, the defendant was not entitled to the benefits of the rule of limited liability applying to charitable institutions in tort actions.

It appears that the court, as does the plaintiff herein, relied primarily upon sections of the General Code relating to the unlawful sale of adulterated and unwholesome food for human consumption and particularly the case of Yochum v Gloria Inc., 134 Oh St 427.

Sec. 8395 GC reads in part as follows:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"1. When the buyer, expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

Counsel for plaintiff in their brief set forth that in the case of Yochum v Gloria, supra, our Supreme Court considered the applicability to food and drink sold by a restaurant of the implied warranty of fitness created by §8395 GC, and point out that the plaintiff sued in that case for damages by reason of illness which resulted from drinking water contaminated with

146

bacteria, served by the defendant restaurant. The first cause of action was based upon breach of implied warranty. The second cause of action charged a violation of the pure food laws. The trial court had refused to submit the first cause of action to the jury. The supreme court ruled that the failure of the trial court to submit to the jury the first cause of action based upon breach of implied warranty were reversible error.

In its first syllabus the court stated the law as follows:

"1. Under the provisions of §8395 GC relating to the subject of warranty, a restaurant owner who supplies his customers with water for drinking purposes from his own well impliedly warrants the reasonable fitness of such water for its intended use."

The second syllabus is as follows:

"2. Under such circumstances the supplying of water that is unfit for human consumption constitutes a violation of §12758 GC of the pure food laws of Ohio."

Sec. 12758 GC cited by the Supreme Court in the second syllabus, provides a penalty for the sale of adulterated food as defined by the Act. A careful examination of the case of Yochum v Gloria, supra, seems to us not to sustain the argument advanced by plaintiff, because the Supreme Court after discussing the assignments of error at length finally determined as expressed at page 431, and in the third paragraph of the syllabus, that a violation of the pure food statutes of Ohio constitutes negligence per se.

At page 430, as bearing on the question of the violation of the pure food laws, the court said:

"The plaintiff next complains that the trial court refused to charge the jury that a violation of the pure food and drug laws of Ohio is negligence per se. The correctness of the plaintiff's position is shown by the unambiguous language of §5775 GC which provides ipsissimis verbis that 'the term 'food' as used in this chapter includes all articles used by man for food, drink, flavoring extract, confectionary or condiment, whether simple or mixed or compound.' However, the defendant contends that the water supplied to the plaintiff was not 'adulterated' within the meaning of §5778 GC which reads in part as follows: * * * * * * ."

We think a clear inference which must be drawn from the opinion of the court in this case is that whether there is a violation of the pure food statutes which is negligence per se, or a breach of an implied warranty, the action sounds in tort where personal injuries from the basis of an action for damages.

Numerous authorities are cited by opposing counsel in their able briefs concerning the question of whether or not this action insofar as it relates to an implied warranty of fitness of foods sounds in contract or tort.

It would unduly burden this opinion to discuss the numerous authorities pro and con on this question and to trade the law of implied warranty in relation to contracts of sale of food. There appears to be a conflict of authority on this question. It is quite clear, however, that throughout the history of jurisprudence a clear distinction has always been made between the obligation imposed by contract and implied warranties which arise therefrom purely by operation of law.

In the instant case, the petition of the plaintiff seems to be predicated primarily on negligence, because the plaintiff in her petition says that the defendant was reckless and negligent in the following respects, and in paragraph 7 of the specifications states:

"In providing impure, infected and dangerous food and drink * * * * in violation and breach of its promise and/or implied warranty that the food provided, served and sold in said restaurant would be fit for human consumption."

We are not content, however, to rest our decision solely upon this language but for the purpose of this opinion we conclude that the plaintiff is relying upon an implied warranty of fitness as well.

We think by the greater weight of authority the action in this case is ex delicto and not ex contractu in the sense that it is based upon the violation of an obligation imposed by law. We think, also, this conclusion is in harmony with Ohio law, on this subject.

It would seem that whether the liability is based upon a breach of implied warranty or negligence, that the result is the same. The action for damages for personal injury and illness is tortious in nature and the rule of limited liability in favor of eleemosynary or charitable institutions must be applied.

We conclude, therefore, that the court erred in directing a verdict for the plaintiff and in submitting to the jury the question of damages. The court also erred in failing to direct a verdict in favor of the defendant on its motion made at the conclusion of all the evidence, and therefore we proceed to render the judgment the trial court should have entered, and render final judgment for the defendant appellant.

MORGAN, J, and SKEEL, J, concur.