George Lee MIMS, Sr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 20626.

United States Court of Appeals Fifth Circuit.

Feb. 16, 1967.

James F. Snelling, St. Petersburg, Fla., for appellant.

Joe H. Mount, Asst. U. S. Atty., Tampa, Fla., for appellee.

Before T U T T L E, Chief Judge, BROWN, Circuit Judge, and BREW-STER, District Judge.

BREWSTER, District Judge:

The first count of the indictment charged that on or about July 1, 1962, appellant and Willie Joe Henderson, Thomas Napper, George Lee Mims, Jr., Dennis Michael O'Connor and Stephen Robert O'Connor armed and disguised themselves and unlawfully attempted to enter the Madeira Beach Bank, in Madeira Beach, Pinellas County, Florida, with intent to rob the bank by force and violence and by intimidation. The second count charged that during the period from June 5, 1962 through the following July 11th appellant conspired with the other parties named above to enter and rob the Madeira Beach Bank, and that nine overt acts were committed in furtherance of the conspiracy. For reasons that will be apparent from the summary of facts, the persons other than appellant named in the indictment as participants in the offenses were not charged as defendants therein. Henderson appears to have waived indictment and to have received a probated sentence on a plea of guilty, and the others were handled as juveniles.

The appellant entered a plea of not guilty to each count, and in connection therewith his counsel advised the court and jury that evidence would be offered raising a question as to his sanity at the time of the alleged offenses. The jury convicted appellant on each of the two charges.

The only questions serious enough to warrant discussion are whether the evidence raises a reasonable doubt as a matter of law as to the appellant's criminal responsibility for the acts charged; and whether plain error appears in the court's charge in connection with the first count.

The importance appellant attaches to the nature of the robbery plan, in connection with the insanity question, requires a more detailed fact statement than would be otherwise necessary. Since the jury decided the case against the appellant, the facts and legitimate inferences making up that statement must, of course, be determined by reviewing the evidence from the standpoint most favorable to the government. Based on the evidence before them, the jury was justified in reaching the conclusions contained in the summary that follows.

Appellant was a middle-aged mechanic who had been employed at the municipal garage in Treasure Island, Florida, near Madeira Beach, for several years prior to the incidents here involved. His wife died in March, 1962, leaving him with two children by their marriage. One of them was George Lee Mims, Jr., 13 years of age, and the other was a daughter several years older. Within less than 60 days after the death of his wife, he and a married woman with two children had agreed to marry each other if she could persuade her husband to get a divorce. There was some delay about the divorce, and she moved into appellant's house with her children in the middle of June, and continued to live there with him without benefit of clergy until they married shortly before the trial in the following year.

The additions to the appellant's household brought on financial difficulties, even though he was moonlighting on a filling station job three evenings a week and was handling a little repair work on his friends' personal cars on some weekends. He was also having some serious problems with his children. The nature of them was not disclosed. He apparently tried to solve his problems by drinking, and during June and July he frequently drank to excess. Some calls to the Madeira Beach Bank prior to June for the purpose of repairing adding machines had given him access to and familiarity with the area of the bank where the money was kept and he began to consider robbing it. In early June,

he implicated Willie Joe Henderson, a 22 year old Negro with an eleventh grade education who worked under him at the garage. He also involved his son, George Lee Mims, Jr., Dennis O'Connor, a 15 year old boy who had run away from home and moved into appellant's house, and Stephen O'Connor, 14 years old.

Guns and ammunition were procured, so that at the time of the two trips to the bank each participant was armed with a loaded pistol, a shotgun or a rifle. For disguises, they had coveralls, sailor hats and face masks. Appellant explained to his companions that the advantage of the coveralls was that they could be put on over street clothes and taken off quickly. By virtue of knowledge gained while working on the adding machines in the bank, the appellant gave each of his companions a definite assignment to do while in the bank. He had also concluded that the fewest customers would be in the bank around closing time, so he planned to enter it just before it closed its doors to the public for the day.

The first trip to the bank for the purpose of robbing it was Saturday, July 7th. At that time Thomas Napper was not involved. All the other participants met at the garage where appellant and Henderson worked at a time when it was closed for business that day. They put on their coveralls and disguises, got into a car and drove to the bank, intending to reach there about five minutes before closing time. However, they miscalculated the time, and got there a few minutes after it had closed. When they arrived and saw the situation, they left without making any attempt to go into the bank.

The next visit to the bank was on Wednesday, July 11th. On the previous day, the appellant rented from the King Car Rentals Service in Treasure Island a Ford Galaxie bearing Florida license plates for use in going to and from the bank. Before going to the bank he put some stolen out-of-state license plates over the Florida plates. He also rented an apartment with a private garage in an area that could be reached quickly after leaving the bank. The rented car was put in the garage at the apartment on July 10th and left there until it was used for transportation to the bank. The plan was that the participants could come to the apartment in their own cars, put on their disguises there, go to the bank in the rented car, rob the bank and return to the apartment before police began to watch the cars on the streets, shed their disguises, hide the get away car, guns and disguises in the apartment and garage, and then leave in their regular clothes in small groups in the other cars.

Willie Joe Henderson brought his cousin, Thomas Napper, to the apartment and had him included in the group that was to rob the bank. The appellant was under the influence of whiskey when he appeared that day, and brought two bottles of whiskey with him. When all the parties had put on their disguises and were ready to go, appellant suggested to them that a drink of whiskey would settle their nerves. Some of them took a drink. They drove to the bank parking lot in the rented car, and sent Henderson around to see if the bank was still open. It was, but he was getting reluctant to go through with the robbery and went back and told them the bank was closed. They knew that he had been wavering, and began to doubt his statement after a few minutes; so all of them went around to the bank entrance with intention to go in and commit the robbery, if the bank was still open. The proof indicates that they had no more intention of forcing their way in if the bank was closed, than they had when they went to the bank on the preceding Saturday. By the time they got to the entrance, the bank had actually closed for the day. A Mrs. Barkiewicz was at the door shaking it to attract the attention of one of the bank employees to get him to let her in to correct an error in a deposit she had made a few minutes before closing time. One of the boys placed the muzzle of his pistol at the side of her head, and another one told her that they were going to rob the bank. She thought it was a

prank. When she replied that it was too late, as the bank had already closed, one of appellant's party said, "Let's get out of here", and they ran back to their car and fled.

The tellers in the bank knew of Mrs. Barkiewicz's plan to return after closing time, and it was their intention to open the door for her for that purpose. A teller started to the door to admit her; but through the plate glass door he saw the group wearing disguises and carrying weapons. He decided that they were there to rob the bank and stopped before he got to the door. He testified that one of the group did push on the door as if to enter. The testimony of all the other witnesses, including Mrs. Barkiewicz who was right at the door during the entire time the group was there, was to the effect that none of the participants in the planned robbery ever put a hand on the door or made any effort to enter the bank.

The group returned to the apartment quickly, drove the rented car into the garage and closed the door. They then took off their disguises and put them and their guns and ammunition in the trunk of that car. The O'Connor boys and George Mims, Jr., remained at the apartment while the appellant was driving Henderson and Napper in his Oldsmobile to their homes. They were halted on the way by a patrolman who had heard a broadcast that a bank robbery had been attempted by a group of white and Negro males. Before the officer got to the car, the appellant instructed Henderson and Napper to remain silent and let him do the talking. The appellant got out of the car, identified himself by his driver's license, and asked why he was stopped. When he was told that there had been an attempt to rob a bank at the beach, he replied that he was surprised that anyone was crazy enough to try to rob a bank. The officer observed nothing unusual about appellant in the ten minutes he talked to him, and let him and his passengers proceed on their way.

After the appellant's narrow escape when he was stopped in his Olds, he changed to a Chevrolet when he got home and waited until about dark to return to the apartment to get the other boys. The appellant did not know it, but the apartment was under surveillance by that time on account of reports received by the police. Colonel Moore happened to be in his yard nearby when the weapons were being taken to the rented car, and saw a man carry a rifle into the garage in a way that led him to believe he was trying to conceal it. Shortly after the incident at the bank, the attention of a person across the street from the apartment was attracted by the hurried manner in which the rented car was driven into the driveway and the garage. He noticed that one corner of the out-of-state license plate had come loose and thereby caused the plate to hang in such a manner that it exposed a Florida license plate underneath. When news was broadcast that there had been a bank robbery, each of those incidents was reported to the officers.

When the appellant heard one of the boys say he saw a police car approaching, he ran to the back of the house and hid. The car stopped and then went on. Appellant then loaded the boys in the Chevrolet and started home. A Madeira police cruiser began following them and a wild chase ensued that took them through Treasure Island and into St. Petersburg. Broadcasts over police radio for help resulted in police cruisers from St. Petersburg joining in the chase. The appellant was driving at a speed over 90 miles per hour and was swerving from one side of the road to the other. Several shots were fired during the chase, which finally ended when appellant's car crashed into a light pole. The car was smashed up, and while the appellant sustained some injuries, he got out of his car and attempted to get away. He was taken to the hospital and treated for lacerations. The arresting officer stayed there with him for about an hour and a half. At first, he gave a fictitious name. After he found that his correct

identity had been determined from papers in his wallet, he told the officer, "I guess at one time everybody has tried to make a bet."

A search of the apartment by a Special Agent of the F.B.I., under a search warrant issued by a Circuit Judge of the State of Florida acting as a magistrate, resulted in recovery of the guns, ammunition, disguises, Ford Galaxie and two whiskey bottles. All except the Ford were offered in evidence.

In interviews with an F.B.I. agent on the evenings of July 11th and 12th, appellant denied any knowledge of or connection with any plan or attempt to rob the Madeira Beach Bank, and attempted to give an alibi.

By his motion for judgment of acquittal and his motion for new trial, the appellant raised the question that the evidence established a reasonable doubt as to his sanity as a matter of law. The decision of this question will turn on whether the government was required to rebut the expert opinion testimony of appellant's witnesses by like evidence in order to discharge its burden of proving appellant's sanity beyond a reasonable doubt.

We agree with the appellant's statement of the general rule governing the burden of proof on the sanity issue in federal criminal cases. The sanity of the accused is always an element of the offense charged; and the presumption of sanity, standing in the place of evidence when no question is raised about the issue, takes care of the prosecution's burden of proving sanity. But when evidence of insanity is received, regardless of the source, that presumption disappears, and the prosecution has the burden of proving the mental capacity of the accused beyond a reasonable doubt.[1] However, no case has been cited to us, and we have found none, laying down the arbitrary rule that an accused is entitled to a judgment of acquittal merely because he offers expert opinion evidence on the issue of his insanity and the prosecution attempts to rebut it without expert witnesses. On the other hand, one of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the *credibility* and *weight* of expert opinion testimony are for the trier of facts, and that such testimony is ordinarily not conclusive even where it is uncontradicted.[2] The Supreme Court of

---

1. Davis v. United States, 160 U.S. 469, 496, 16 S.Ct. 353, 40 L.Ed. 499, 505 (1895); Dusky v. United States, 8 Cir., 295 F. 2d 743, 754 (1961), cert. den. 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536, and cases cited.

2. Head v. Hargrave, 105 U.S. 45, 49, 26 L.Ed. 1028, 1030 (1881); The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1896); United States for Use and Benefit of Caldwell Foundry and Machine Co. v. Texas Construction Co., 5 Cir., 237 F. 2d 705 (1955); Hallabrin v. C.I.R., 6 Cir., 325 F.2d 298, 301 (1964); Dayton P. & L. Co. v. Public Utilities Comm., 292 U.S. 290, 299, 54 S.Ct. 647, 652, 78 L.Ed. 1267, 1275 (1933); Fox River Paper Corp. v. United States, 7 Cir., 165 F.2d 639 (1948); Sartor v. Arkansas Nat. Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967, 972 (1943); Carpenter v. United States, 4 Cir., 264 F.2d 565 (1959); United States v. Cain, 7 Cir., 298 F.2d 934 (1962); Feguer v. United States, 8 Cir., 302 F.2d 214, 242 (1962);

Holm v. United States, 9 Cir., 325 F.2d 44 (1963); Dusky v. United States, 8 Cir., 295 F.2d 743 (1961), cert. den. 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536; Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, cert. den. 253 Ala. 246, 43 So. 2d 839, cert. den. 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (1950); Smith v. Smith, 254 Ala. 404, 48 So.2d 546, 551; Burdine v. Partee Flooring Mill, 218 Ark. 60, 234 S.W.2d 193 (1950); People v. Williams, 151 Cal.App.2d 173, 311 P.2d 117, cert. den. 355 U.S. 961, 78 S.Ct. 547, 2 L.Ed.2d 535 (1957); McWilliams v. Garstin, 70 Colo. 59, 197 P. 246 (1921); Chazen v. City of New Britain, 148 Conn. 349, 170 A.2d 891, 893 (1961); Clark v. Haggard, 141 Conn. 668, 669, 109 A.2d 358, 54 A.L.R.2d 655 (1954); Taylor v. Taylor, Fla.App., 119 So.2d 811, 813 (1960); Buckhanon v. State, 151 Ga. 827, 108 S.E. 209, 212 (1921); Childs v. Logan Motor Co., 103 Ga.App. 633, 120 S.E.2d 138, 143 (1961); Application of Big Lost River Irr. Dist., 78 Idaho 591, 307 P.2d 788, 790 (1957); People v. Har-

the United States has said that the trier of the facts is not limited to a compromise and balancing of opinions of expert witnesses in reaching its decisions,[3] and that there is no rule of law that requires the judgment of witnesses to be substituted for that of the jury.[4]

There is no good reason to make an exception for expert opinion evidence on insanity. It is just as subject to error as expert testimony on other matters. Psychiatry itself has progressed rapidly; but it is still a comparatively young profession [5] dealing, not with an exact science, but with a controversial and rapidly developing one.[6] In addition, the psychiatrist and the jury in a criminal case where insanity is an issue are

vey, 286 Ill. 593, 122 N.E. 138; Clark v. Lucas Co. Bd. of Review, 242 Iowa 80, 44 N.W.2d 748, 754 (1951); Denman v. Colorado Interstate Gas Co., 179 Kan. 180, 294 P.2d 207, 210 (1929); G. & H. Cattle Co. v. Commonwealth, 312 Ky. 315, 227 S.W.2d 420; Louisville & N. R. Co. v. Rowland's Admr., 227 Ky. 841, 14 S.W.2d 174, 178 (1929); Bernard v. Francez, 166 La. 487, 117 So. 565 (1928); Sanborn v. Elmore Milling Co., 152 Me. 355, 129 A.2d 556 (1957); A. B. Beard & Son v. Ministrelli Constr. Co., 372 Mich. 364, 126 N.W.2d 695 (1964); Berg v. Ullevig, 244 Minn. 390, 70 N.W.2d 133, 138 (1955); Robinson v. McShane, 163 Miss. 626, 140 So. 725 (1932); State v. Quilling, 363 Mo. 1016, 256 S.W.2d 751 (1932); Sunset Acres Motel, Inc. v. Jacobs, Mo., 336 S.W.2d 473 (1940); State Board of Medical Examiners of New Jersey v. Plager, 118 N.J.L. 434, 193 A. 698 (1937); Pacifico v. Carpenter Steel Co., 44 A.2d 79, 23 N.J.Misc 309, cert. den. 134 N.J.L. 149, 46 A.2d 381, aff. 135 N.J.L. 204, 50 A.2d 894 (1945); State v. Moore, 42 N.M. 135, 76 P.2d 19, 34 (1938); Commercial Cas. Ins. Co. v. Roman, 269 N.Y. 451, 199 N.E. 658 (1936); Hodges v. State, 16 Okl.Cr. 183, 182 P. 260; Equitable Life Assur. Soc. of U. S. v. Neale, Okl., 258 P.2d 654, 658 (1953); Vey v. State, 35 Ohio App. 324, 172 N.E. 434; Lovich v. Salvation Army, 81 Ohio App. 317, 75 N.E.2d 459, 561 (1947); State v. Leland, 190 Or. 598, 227 P.2d 785, aff. 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302; City of Portland v. Ruggero, 231 Or. 624, 373 P.2d 970, 973 (1962); Ray, to Use of Miller v. City of Philadelphia, 344 Pa. 439, 25 A.2d 145, 146 (1942); Cardall v. Shartenberg's, Inc., 69 R.I. 97, 31 A.2d 12, 16 (1943); Thompson v. Atlantic Coast Line R. Co., 113 S.C. 261, 102 S.E. 11 (1920); Gustafson v. Gate City Co-op Creamery, 80 S.D. 430, 126 N.W.2d 121 (1964); Casteel v. Southern Ry. Co., 187 Tenn. 586, 216 S.W.2d 321 (1948); O'Keefe v. State, 145 Tex.Cr.R. 349, 167 S.W.2d 1035 (1942); Kelly v. Industrial Comm. of Utah, 80 Utah 73, 12 P.2d 1112 (1932); State v. Putzell, 40 Wash.2d 174, 242 P.2d 180 (1952); Richey & Gilbert Co. v. Northwestern Nat. Gas Corp., 16 Wash.2d 631, 134 P.2d 444, 453 (1943); Miracle v. Barker, 59 Wyo. 92, 136 P.2d 678, 684 (1943); Webb v. Chesapeake & O. Ry. Co., 105 W.Va. 555, 144 S.E. 100 (1928); Washburn v. Skogg, 204 Wis. 29, 233 N.W. 764, 769, 235 N.W. 437 (1930); 7 *Wigmore on Evidence*, 3d ed. # 1920, p. 18; 11 R.C.L. # 536, 24 Am.Jr., p. 1059; Weihofen, *Mental Disorder as a Criminal Defense*, p. 290.

3. Head v. Hargrave, supra, note 2.

4. The Conqueror, supra, note 2.

5. Leland v. State of Oregon, 343 U.S. 790, 800, 72 S.Ct. 1002, 96 L.Ed. 1302, at 1310 (1951); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, at 861.

6. The two quotations in this footnote are taken from dissenting opinions, but there appears to have been no disagreement between the majority and the minority over the statements quoted.

Mr. Justice Frankfurter, in Leland v. State of Oregon, supra, note 5, 343 U.S. at 803, 72 S.Ct. at 1009, 96 L.Ed. at 1311, said:

" * * * One does not have to echo the scepticism uttered by Brian, C. J., in the fifteenth century, that 'the devil himself knoweth not the mind of men' to appreciate how vast a darkness still envelops man's understanding of man's mind. Sanity and insanity are concepts of incertitude. They are given varying and conflicting content at the same time and from time to time by specialists in the field. Naturally there has always been conflict between the psychological views absorbed by law and the contradictory views of students of mental health at a particular time. * * * "

Chief Judge Miller in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 861, said:

"The rulings to which I refer have become especially necessary because of the frequent alteration and expansion of the definition of 'mental disease' by those experts who appear most frequently as witnesses in this jurisdiction. They sud-

concerned with entirely different questions.[7] The psychiatrist deals with the question of the defendant's behavior problems from a clinical standpoint in an atmosphere of a physician-patient relationship. On the other hand, a jury is charged with the duty of determining from the evidence admitted in an adversary proceeding the broader question of the criminal responsibility of the accused.[8] That issue includes the questions not only of whether the defendant had a mental defect or disease at the time of the alleged offense, but also of whether any such defect or disease, if found to exist, met the legal test of insanity,[9] as an accused may have a mental disorder or deficiency and in some cases still be mentally competent to be held legally responsible for his crime.[10]

---

denly reclassified psychopathic (sociopathic) personality as a mental disease in In re Rosenfield, 157 F.Supp. 18 (D.D.C. 1957); they reclassified emotionally unstable personality as a mental disease in Campbell v. United States, supra: they reclassified narcotics addiction as a mental disease in United States v. Carroll, Criminal No. 383–62 (D.D.C. June 28, 1962) and United States v. Horton, Criminal No. 59–62 (D.D.C. July 12, 1962). I think it obvious that the new classifications were made by the doctors for clinical purposes only, for demonstration is not needed to make it plain that these conditions newly called 'mental diseases' are not such in the legal sense. Until now, this court has allowed the *shifting wind of expert nomenclature* to control its decisions." (Emphasis added).

7. *General Principles of Criminal Law*, 2d ed., p. 455, et seq. (1960), by Hall, Distinguished Service Professor of Law, Indiana University. The following is quoted from pp. 464–465:

"In the first place, a criminal trial, while it ought to use the best available knowledge, is not a scientific inquiry or an experiment in a clinic. For reasons which have long been persuasive, it is an adversarial investigation. The psychiatrists' work does not call upon them to decide whether their patients should or could have acted differently than they did, whether, i. e. they had the capacity to conform. But it is precisely this question which does make sense in everyday life; and it is the central issue in the trial. In many scientific inquiries a preponderance of the evidence suffices, and majority opinion among the elite prevails. In a criminal trial, because of the human values at stake, the jury must be convinced beyond any reasonable doubt, and they must be unanimous in their verdict. It is also rather widely believed that experts are prone to decide not on the evidence but 'almost always on their own private opinion of the subject-matter.' Disagreement is frequent even among experts in well-established sciences. Disagreement among psychiatrists is to be expected; indeed, a lack of disagreement would raise doubts regarding their integrity or competence. Psychiatrists can defer their acceptance of any proffered theory or interpretation indefinitely and the thorough diagnosis of a single patient may take a year or longer; in a criminal trial definite decisions must be reached within a short time.

"Moreover, the question of mental disease, viewed as a legal issue, cannot be separated from other legally material issues; hence, unless the entire body of relevant law were completely abandoned, it would still be necessary to have a jury or judge to interpret what the experts found and how that affected *mens rea* and the other issues. The criminal trial seeks to ascertain whether the accused had the normal competence to make a moral decision; many psychiatrists insist that they know nothing about this sort of question. There are also sound reasons of policy, implemented by constitutional guarantees, for the retention of trial by judge or jury; and a basic postulate in a democratic society is the avoidance of government by experts in crucial areas of law-making and adjudication."

See also Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617 (1957), and McDonald v. United States, supra, note 5, 312 F.2d at p. 851.

8. Carter v. United States, 102 U.S.App. D.C. 227, 252 F.2d 608 (1957); Carter v. United States, 5 Cir., 325 F.2d 697, 706; Gleuck, *Mental Disorder and the Criminal Law*, pp. 33, 34; Hall, *Psychiatry and Criminal Responsibility*, 65 Yale L.J. 761 (1957).

9. Carter v. United States, supra, note 8, at p. 615 of 252 F.2d.

10. Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1945); Smith v. United States, 9 Cir., 267 F.2d 210 (1959); Lee v. Wiman, 5 Cir., 280 F. 2d 257, 265 (1960); Feguer v. United States, supra, note 2; Hall, *Psychiatry and Criminal Responsibility*, supra, note

■ The sound rule is that the issue of insanity, when raised as a defense in a criminal case, should be determined by the jury from all the evidence,[11] rather than from the opinions of experts alone, subject to the control that the court may always set aside an unreasonable verdict.[12] The real value of expert testimony in these cases is "in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in [the] mere expression of conclusion."[13] However, even though expert opinion evidence is generally advisory in nature,[14] it cannot be arbitrarily ignored.[15]

■ It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based,[16] "the reasoning by which he progresses from his

---

8, who says at p. 767: "It is a fact that among those who are held legally responsible there may yet be various degrees of mental impairment."

11. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L.Ed. 499 (1895); on second appeal, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897); United States v. Currens, 3 Cir., 290 F.2d 751, 762 (1961); McDonald v. United States, supra, note 7.

The following is quoted from the majority opinion at page 851 of 312 F.2d in the *McDonald* case:

"We emphasize that, since the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be *controlled by expert opinion*. The jury must determine for itself, *from all the testimony, lay and expert*, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms. What we have said, however, should in no way be construed to limit the latitude of expert testimony. Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617." (Emphasis added).

12. Feule v. Parsons, 160 Iowa 454, 141 N.W. 1049; Miracle v. Barker, supra, note 2.

13. Carter v. United States, 102 U.S.App. D.C. 227, 252 F.2d at page 617, supra, note 8.

14. Application of Big Lost River Irr. Dist., supra, note 2.

15. Rhodes v. State, 232 Ala. 509, 168 So. 869; Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, 106, cert. den. 260 Ala. 699, 71 So.2d 107; Buckhanon v. State, 151 Ga. 827, 829, 108 S.E. 209, 212.

16. W. Horace Williams Company v. Serpas, 5 Cir., 261 F.2d 857, 860 (1957); Gendelman v. United States, 9 Cir., 191 F.2d 993 (1951), cert. den. 342 U.S. 909, 72 S.Ct. 302, 96 L.Ed. 680; Martin v. United States, 109 U.S.App.D.C. 83, 284 F.2d 217 (1960); Carter v. United States, 102 U.S. App.D.C. 227, 252 F.2d 608; Carpenter v. United States, 4 Cir., 264 F.2d 565, at p. 570 (1959); Tri-Angle Club, Inc. v. United States, 8 Cir., 265 F.2d 829, 832 (1959); Clark v. Lucas County Board of Review, supra, note 2; People v. Williams, supra, note 2.

The following quotations are taken from the cases just cited:

*Serpas:* Chief Judge Tuttle said that there could be no dispute as to the correctness of the proposition that, "the value of the opinion of an expert witness is dependent on and is no stronger than the facts upon which it is predicated, and it has no probative force unless the premises upon which it is based are shown to be true * * *." 261 F.2d p. 860.

*Carter:* " * * * The chief value of an expert's testimony in this field (insanity defense), as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion * * *." 252 F.2d p. 617.

*Carpenter:* "If the facts [upon which doctors based an opinion as to temporary insanity] were not what the doctors supposed, their opinions were baseless and of no evidentiary value * * *" 264 F.2d p. 570, and

" * * * (T)he expressed opinions could be tested by the jury in the light of their (the experts) factual assumptions." p. 571.

material to his conclusion," [17] the interest or bias of the expert,[18] inconsistencies or contradictions in his testimony as to material matters,[19] material variations between the experts themselves,[20] and defendant's lack of co-operation with the expert.[21] Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms,[22] or where it is based on narrative statements to the expert as to past events not in evidence at the trial.[23] In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him.[24] One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person.[25]

The expert witnesses offered by appellant consisted of a doctor who was engaged in general practice, an osteopath, and three psychiatrists. Both the general practitioner and the osteopath treated appellant on one occasion each for matters that had no relation to mental illness, and neither one of them made any kind of examination to determine his mental condition. The doctor saw appellant on account of blood poisoning that resulted from injuries sustained in the wreck at the time of the arrest. The osteopath gave appellant some pills about two months before the occurrences at the bank to help him recover from the after effects of a drunken spree. Both the doctor and the osteopath admitted on cross examination that the conditions they described as being abnormal at the time they saw appellant could have been due to the physical troubles they were treating. The examinations of appellant by the psychiatrists appear to have been the type usually given by psychoanalysts who are called upon to give hasty opinions. There was no record of any prior psychiatric treatment. Each psychiatrist met appellant for the first time in his life on the date he examined him, and those dates ranged from six weeks to eight months after July 11, 1962. The time each psychiatrist spent with appellant varied from about

17. Carter v. United States, 102 U.S.App. D.C. 227, at p. 617 of 252 F.2d, supra, note 8. This ground would, of course, include the expert's incompetency to evaluate the facts in the particular field involved. Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 299–300, 54 S.Ct. 647, 652, 78 L.Ed. 1267, 1275 (1933); Morris v. United States, D.C.Tex. 217 F.Supp. 220, 228 (1963). For instance, in the *Morris* case, the expert's lack of understanding of the legal principles involved in certain extraneous litigation caused him to make an incorrect evaluation of the subject's delay in bringing a divorce case to trial.

18. Dayton Power & Light Co. v. Public Utilities Commission, supra, note 17.

19. Holm v. United States, 9 Cir., 325 F.2d 44 (1963); Hallabrin v. C.I.R., supra, note 2, at p. 301 of 325 F.2d.

20. Dayton Power & Light Co. v. Public Utilities Commission, supra, note 17; Fox River Paper Corp. v. United States, 7 Cir., 165 F.2d 639, 640 (1948); Martin v. United States, supra, note 16.

21. Carpenter v. United States, supra, note 16, at p. 571 of 264 F.2d.

22. Brouillard v. S.S. Kresge Co., D.C.Wis., 41 F.Supp. 945, 946 (1941); Johnson v. Great Northern Ry. Co., 107 Minn. 285, 119 N.W. 1061; Panko v. Grimes, 40 N.J.Super. 588, 123 A.2d 799; Terry Dairy Products Co. v. Cash, 224 Ark. 576, 275 S.W.2d 12; 32 C.J.S. Evidence § 569(3) p. 623.

23. Johnson v. Johnson, N.D., 104 N.W.2d, 82 A.L.R.2d 1029, 1038 (1960); In re Bottger's Estate, 14 Wash.2d 676, 129 P.2d 518; Dowling v. Luisetti, 351 Mo. 514, 173 S.W.2d 381.

24. State Board of Medical Examiners of New Jersey v. Plager, 118 N.J.L. 434, 193 A. 698 (1937).

25. Martin v. United States, supra, note 16, at p. 220 of 284 F.2d; Holm v. United States, supra, note 19; Morris v. United States, supra, note 17, at p. 229 of 217 F.Supp.

one hour to an hour and forty-five minutes. All the clinical findings supported the conclusion that he was then in good contact, coherent, relative, fully oriented in all three spheres, and that his memory for both recent and remote events was intact.[26] Each such expert testified that on the basis of what he himself saw and heard at the examination the appellant was not then psychotic or mentally ill. None of them found any brain damage, anatomical defect, functional disorder, neurosis or evidence of a condition of a constant or possibly recurring nature that might have affected appellant's mental competency at the time of the alleged offenses.

Each of the retrospective opinions as to appellant's mental condition during the critical period in June and July, 1962 was based either entirely or primarily upon narrative statements of appellant and his then common-law wife, Mrs. Stone,[27] communicated to the examining psychiatrist, either directly by one or both of them, or indirectly through hearsay written reports of others who got their information from appellant and Mrs. Stone. Based entirely upon the hypothesis that this narrative information as to the appellant's conduct out of the presence of the psychiatrists was true, each of them came to the conclusion that appellant had an emotional problem precipitated by grief over the death of his wife in March, 1962, which, complicated by his excessive drinking, produced a psychotic episode that rendered him incapable of knowing what he was doing during the period covered by the conspiracy in June and July, 1962, of knowing right from wrong as to the acts charged, and of refraining from doing such acts. The psychiatrists were of the opinion that that was the only such episode he had ever had. The appellant's legal irresponsibility was attributed to a personality disorder, and not to a mental disease, deficiency or defect.

The government offered no expert witness to rebut this opinion evidence. It relied upon factual proof, non-expert opinion testimony and weaknesses in the testimony of appellant's experts made evident by cross examination. We are of the opinion from all the evidence that the expert opinion testimony was not conclusive for each of the following reasons:

1. The appellant and Mrs. Stone were deeply interested in the outcome of the case, and the credibility of their narrative statements that formed the basis for the expert's factual assumptions was for the jury.

2. There was evidence from which the jury could reasonably conclude that several of the material factual assumptions of each expert were incorrect.

3. The jury had a much broader view of the entire picture from all the evidence than the experts had from the sparse and biased narratives given by appellant and Mrs. Stone; and, under the facts of this case, the jury did not have to agree with the reasoning by which the experts progressed from their material to their opinions.

4. All the experts lacked knowlege of several material facts.[28]

---

26. The rationality, relevancy and coherence of the appellant's statements to the psychiatrists during the examinations is included in this statement, as, in psychiatric examinations, the patient's utterances "are taken as evidence of bodily characteristics." Weihofen, *Mental Disorder as a Criminal Defense*, p. 294. The appellant's answers and statements during each examination were rational, relevant and coherent.

27. The term "common-law wife" is used in the loose, lay sense. It is recognized that there could be no valid common marriage while she was still married to Mr. Stone.

28. The following are some of the facts not known to any of the experts:
 (1) The appellant's elaborate plan to escape detection after the robbery, and his efforts during the several hours immediately following the occurrence at the bank to avoid detection.
 (2) His conduct at the time he was apprehended.
 It is well recognized that a criminally irresponsible person may make an elaborate and cunning plan for committing a

5. The short time spent on the examinations.[29]

The only matter sought to be established by the testimony of appellant's non-experts was that during the interval of approximately three and a half months between the time of his wife's death and the occurrence at the bank, he appeared to be nervous, tense and pre-occupied. The testimony was far from conclusive; but even if it had been established that appellant was suffering from an emotional disturbance, the bearing of such instability on the issue of his criminal responsibility was an issue of fact.[30] Appellant's argument as to the bizarreness of his plan falls in the same category.[31]

While the prosecution usually runs some risk of discharging its burden of proof when it attempts to rebut testimony of experts on the sanity question without offering like testimony, we are of the opinion from all the evidence in the record, expert and non-expert, that it met its burden here.[32] There was

crime. However, psychiatrists consider that plans to avoid detection after the crime and conduct at the time of apprehension may shed important light on whether the accused knew his conduct was wrong. *Forensic Psychiatry* (1965), 2d ed, pp. 13–14, by Davidson, M.D., Fellow, American Psychiatry Association, says:

" * * * Where the act was planned, it is necessary to determine whether:

a) The plan was aimed at certainty that the act would be committed; or

b) The plan was drawn up to avoid detection."

"The psychiatrist ought to be told of the circumstances of the apprehension, since this may throw considerable light on the offender's general state of mind and of his evaluation of the wrongfulness of his acts."

(3) Appellant's statement when he was stopped by Patrolman Jones about an hour after the incident at the bank that a person would have to be crazy to attempt to rob a bank. In Birdsell v. United States, 5 Cir., 346 F.2d 775, 779, 781 (1965), cert. den. 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366, this Court recognized that statements of an accused indicating that he was thinking of insanity as an explanation for his crime were a proper factor to consider on whether he was acting in good faith with the psychiatrist during his examination.

29. The Birdsell case, supra, note 28, in speaking of the inconclusiveness of a diagnosis based on a psychiatric examination that was performed in two hours, said at p. 781: " * * * Dr. Good's diagnosis was reached so quickly that the jury could well have thought he had jumped to a conclusion."

30. The Birdsell case, supra, note 28, at p. 781 says: " * * * It was undisputed that Birdsell was emotionally disturbed. But whether the instability was so severe as to render him insane in the relevant sense during the six months period when he was conspiring to transport stolen automobiles was an issue for the jury to determine under proper instructions, here given in the form approved in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897). * * * "

31. The appellant argues that his plan was bizarre because he implicated his own son and some other teen-agers, and because of the general scheme of it. The extent to which amateurishness and ignorance contributed to the bizarreness was a fact issue. While crimes resulting in direct and intentional injury to members of the family of an accused are subject to close scrutiny, the bearing of the nature of the crime on his sanity is usually a question of fact. Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, cert. den. 253 Ala. 246, 43 So.2d 839, cert. den. 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (parent murdered own child); Roberts v. State, 210 Miss. 777, 50 So.2d 356 (grandfather murdered granddaughter); Brock v. State, Fla., 69 So.2d 344 (father murdered son); Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166 (drunk father murdered daughter); State v. Lucas, 30 N.J. 37, 152 A.2d 50 (church member set fire to his church rectory resulting in deaths of several people); People v. Reade, 1 N.Y.2d 459, 154 N.Y.S.2d 27, 136 N.E.2d 497 (defendant murdered sister-in-law and her young daughter); Noelke v. State, 214 Ind. 427, 15 N.E.2d 950 (father killed child while shooting at wife).

32. Carter v. United States, 102 U.S.App. D.C. 227, 252 F.2d 608; Carpenter v. United States; Dusky v. United States, and Feguer v. United States, all supra, note 2; Birdsell v. United States, supra, note 28; Brown v. United States, 5 Cir., 351 F.2d 473 (1965).

much stronger evidence in favor of the defendant on this issue in the *Birdsell* case, supra, note 28; and this Court, in an opinion by Judge Friendly, held that the case was properly submitted to the jury. The cases relied upon by appellant [33] are distinguishable on several grounds. Insofar as the question here presented is concerned, each one of those cases holds no more than that upon particular facts *in that case,* the court concluded that the government had failed to discharge its burden of proving the sanity of the defendant beyond a reasonable doubt. None of them had the weaknesses in the expert opinion testimony this one has. Most of the defendants had undergone long periods of treatment in mental institutions, and the psychiatrists who had treated them during those times testified to their insanity. The opinions of the psychiatrists were substantially supported by objective symptoms.[34] They presented an entirely different situation from the one in this case where there were jury questions both' as to whether there was a doubt about the appellant's sanity, and, if so, whether the doubt was a reasonable one,[35] and where reasonable inferences could be drawn that appellant was legally responsible for his acts.

We have carefully examined the other points in appellant's brief, and conclude that they show no error.

 While we are of the opinion that the conviction on the conspiracy charge under count two should be affirmed, our examination of the record has convinced us that there was plain error in the jury instructions that requires a reversal of the conviction under count one charging the attempt to enter the bank with the intent of robbing it. We recognize that F.R.Crim.P. 52(b) should be invoked only where exceptional circumstances make it necessary to avoid a clear miscarriage of justice.[36] However, even in the face of F.R.Crim.P. 30, the plain error rule has been consistently applied where the court's charge had the effect of depriving the accused of a substantial right.[37]

In this case the court instructed the jury that they need not spend any time debating as to whether or not an attempt was made to rob the bank, as the evidence showed such attempt as a matter of law. Counsel for the appellant did not object to that instruction, even though he had indicated in his opening statement at the beginning of the trial that the charge

33. Douglas v. United States, 99 U.S.App. D.C, 232, 239 F.2d 52 (1956); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); McKenzie v. United States, 10 Cir., 266 F.2d 524 (1959); Satterwhite v, United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); Pollard v. United States, 6 Cir., 282 F.2d 450 (1960); United States v. Westerhausen, 7 Cir., 283 F.2d 844 (1960); Fitts v. United States, 10 Cir., 284 F.2d 108 (1960); Isaac v. United States, 109 U.S. App.D.C. 34, 284 F.2d 168 (1960); Argent v. United States, 5 Cir., 325 F.2d 162 (1963).

34. We realize and take into consideration that a statement of a patient during a psychiatric examination could possibly be an objective symptom when it is evaluated as to directness, relevancy and coherency, and as to evidence of the inner drives and conflicts of the patient. But the situation is different where the statements are narrative in nature and their value is dependent upon the truth of them.

35. Government of Virgin Islands v. Smith, 3 Cir., 278 F.2d 169, 174 (1960).

36. Cook v. United States, 5 Cir., 320 F. 2d 258 (1963); United States v. Haynes, 2 Cir., 291 F.2d 166 (1961); United States v. Grosso, 3 Cir., 358 F.2d 154 (1966); Ramsey v. United States, 8 Cir., 332 F.2d 875 (1964); Lohmann v. United States, 9 Cir., 285 F.2d 50, 51 (1960).

37. Mann v. United States, 5 Cir., 319 F. 2d 404, 410 (1963); Williamson v. United States, 5 Cir., 332 F.2d 123 (1964), and cases cited in footnote 12 thereof on p. 132; United States v. Raub, 7 Cir., 177 F.2d 312 (1949).

contained in count one would be contested not only on the ground of insanity, but also on the ground "that there was never a valid attempt, an actual attempt to commit the crime as alleged in Count One." The instruction was so peremptory in nature that the error must be noticed without an objection having been made.

A trial court has a wide latitude in commenting on the evidence during his instructions to the jury, but he has no power to direct a verdict of guilty.[38] An instruction deciding a material fact issue as a matter of law adversely to the accused is regarded as a partial instructed verdict of guilty prohibited by the rule just stated.[39] In United States v. Raub, supra, footnote 37, the Court reversed the conviction under the plain error rule where the jury was instructed that a material element of the offense was established as a matter of law.

The appellant was entitled to have the question of whether there was an attempt to enter the bank for the purpose of robbing it submitted to the jury under appropriate instructions covering, among other things, the elements of this type of offense and the test for determining whether the conduct of the participants had gone beyond the intent and preparation stage and had reached the point where an overt act had been committed directly tending to effect the commission of the substantive offense. Much ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparations ends and attempt begins, but the tests adopted in the various jurisdictions fall somewhere between the two extremes represented respectively by the old common law guide and the one suggested by the Model Penal Code of the American Law Institute.[40] The question has not been decided by this Court; but, in the event of another

---

38. United Brotherhood of Carpenters & Joiners of America v. United States, 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973 (1947); Montford v. United States, 5 Cir., 271 F.2d 52 (1959).

39. Brooks v. United States, 5 Cir., 240 F.2d 905 (1957); Roe v. United States, 5 Cir., 287 F.2d 435, 440 (1961); United States v. Manuszak, 3 Cir., 234 F.2d 421 (1956); United States v. McKenzie, 6 Cir., 301 F.2d 880 (1962); United States v. Raub, supra, note 37.

40. Sayre, *Criminal Attempts* (1928), 41 Harv.L.Rev. 821; Arnold, *Criminal Attempts—The Rise and Fall of an Abstraction* (1930), 40 Yale L.Journ. 53; Hall, *Criminal Attempt—A Study of Foundations of Criminal Liability*, 49 Yale L. Journ. 789; Keedy, *Criminal Attempts at Common Law* (1954), 102 Pa.L.Rev. 464; Smith, *Two Problems in Criminal Attempts* (1957), Harv.L.Rev. 422; Wesholer, Jones & Korn, *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy*, 61 Colum.L. Rev. 571, 573 (1961); United States v. Coplon, 2 Cir., 185 F.2d 629, 633, 28 A.L. R.2d 1041 (1955), cert. den. 342 U.S. 920,

72 S.Ct. 362, 96 L.Ed. 688; United States v. Butler, D.C.S.D.N.Y., 204 F. Supp. 339, 343 (1962); People v. Sullivan, 173 N.Y. 122, 65 N.E. 989, 63 L.R.A. 353; People v. Werblow, 241 N.Y. 55, 148 N.E. 786, 789; Commonwealth v. Kennedy, 170 Mass. 18, 48 N.E. 770; Commonwealth v. Peaslee, 177 Mass. 267, 59 N.E. 55; State v. Doran, 99 Me. 329, 59 A. 440, 441, 105 Am.St.Rep. 278; State v. Schwarzbach, 84 N.J.L. 268, 86 A. 423; Groves v. State, 116 Ga. 516, 42 S.E. 755, 756, 59 L.R.A 598; State v Mandel, 78 Ariz 226, 278 P.2d 413, 415; People v. Buffum, 40 Cal.2d 709, 256 P.2d 317, 321; People v. Camodeca, 52 Cal.2d 142, 338 P.2d 903, 906.

The common law test is discussed in the *Coplon* case, and the one suggested by the A.L.I. Model Penal Code is reviewed in the *Butler* case.

The *Buffum* case states a test that has been frequently approved: " * * * Preparation alone is not enough, there must be some *appreciable fragment* of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature. * * * " (Emphasis added.)

trial, help can be obtained from the few federal cases on it.[41]

The conviction under count two is affirmed; and the conviction under count one is reversed and remanded.

41. Wooldridge v. United States, 9 Cir., 237 F. 775 (1916); Gregg v. United States, 8 Cir., 113 F.2d 687, 690 (1940); Giles v. United States, 9 Cir., 157 F.2d 588, 590 (1946); United States v. Coplon, supra, note 40; Lemke v. United States, 9 Cir., 211 F.2d 73, 14 Alaska 587 (1954), cert. den. 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136; United States v. Baker, D.C.S.D.Cal., 129 F.Supp. 684 (1955); United States v. Robles, D.C. N.D.Cal., 185 F.Supp. 82, 85 (1960); United States v. Butler, supra, note 40.

Cases involving attempt to evade federal taxes are not included because they involve a different question. The attempt is usually successful, at least for a while, in those cases, while an essential element of the ordinary attempt offense is that the object intended was not accomplished.

The *Gregg* case, at p. 690 of 113 F.2d, approves that test laid down by Cardozo, Jr., in the *Werblow* case, supra, note 40, " * * * The act must 'carry the project forward within dangerous proximity to the criminal end to be attained'. * * * "

The *Coplon* case, at p. 633 of 185 F.2d, quoted with approval the following from the opinion of Holmes, J., in the *Peaslee* case, supra, note 40: " 'Preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor, although there is still a locus poenitentiae, in the need of a further exertion of the will to complete the crime.' "

In discussing the same question in the *Kennedy* case, supra, note 40, Holmes, J., said: " * * * Every question of proximity must be determined by its own circumstances, and analogy is too imperfect to give much help. * * * "