# UNITED STATES of America

v.

## Oscar B. McINNIS.

### No. B–78–333–S.

United States District Court,
S. D. Texas,
Brownsville Division.

Jan. 23, 1981.

George Kelt, Jr., Asst. U. S. Atty., Houston, Tex., Ruben DeLuna, Asst. U. S. Atty., Brownsville, Tex., for plaintiff.

Frank Maloney, David H. Reynolds, Austin, Tex., Knox Jones, McAllen, Tex., James S. Bates, Edinberg, Tex., for defendant.

## MEMORANDUM AND ORDER

VELA, District Judge.

On the 16th day of October, 1980, came on to be heard Defendant's Fourth Amended Motion to Dismiss. After hearing the evidence and arguments on the same, and after allowing time for compilation of the trial transcript in order to make precise findings and to allow Defendant to define issues on appeal, and after due consideration, this Court is of the opinion that the same should in all things be DENIED.

It is therefore ORDERED, ADJUDGED, and DECREED that Defendant McInnis' retrial on counts 2, 4, 5, 6 and 7 of the Indictment herein is not barred by the Double Jeopardy provisions of the United States Constitution and his Fourth Amended Motion to Dismiss is DENIED as to that point.

Following denial of said motion, this Court herewith enters its Findings of Fact and Conclusions of Law pursuant to the dictates of *United States v. Dunbar*, 611 F.2d 985 (5th Cir. 1980) (en banc), and declares that Defendant has failed to tender a prima facie non-frivolous double jeopardy claim and finds that Defendant's Fourth Amended Motion to Dismiss on Double Jeopardy grounds is totally FRIVOLOUS.

It is therefore ORDERED, ADJUDGED and DECREED, that this Court retains jurisdiction to proceed with the retrial of Defendant pending his appeal of this order.[1]

## I. BACKGROUND

Defendant, Oscar B. McInnis, criminal district attorney for Hidalgo County, Texas, was charged with six counts of perjury under 18 U.S.C. § 1623(a) (Supp.1980) as a result of an appearance before a Federal Grand Jury in Brownsville, Texas, on June 7, 1978. The Grand Jury was investigating the possibility that Defendant and Co-Defendant Patricia Parada had committed a federal offense in plotting to lure Parada's ex-husband, Noe Villanueva, across the international boundary into Mexico where he was to be kidnapped and killed by a Mexican police official. Following appearances by McInnis and Parada before the Grand Jury, an indictment was handed down charging them with conspiracy to kidnap under the Lindberg Act, 18 U.S.C. § 1201, as amended. During his appearance before the Grand Jury, Defendant denied ever having discussed the proposed murder of Villanueva, and denied knowledge of and participation in various particulars of the plot. A superseding indictment, charging McInnis with six additional counts of perjuring himself before a grand jury, and charging Parada with one identical count, was filed on August 1, 1978.

Both McInnis and Parada filed motions to dismiss the kidnapping and perjury charges. After a pretrial hearing on September 8,

---

1. Defendant has filed notice of appeal from a denial of his motion under the decision of the Supreme Court in *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), which holds that courts of appeals have jurisdiction to entertain appeals from pre-trial orders denying dismissal on double jeopardy grounds.

1978, the District Court dismissed all counts of the indictment against both defendants and the government appealed. On appeal, the Fifth Circuit upheld the dismissal of the conspiracy count but re-instated the counts of perjury against both Defendants.[2] After lengthy trial of the perjury counts in September, 1980, the jury was unable to reach a verdict on five counts of perjury against McInnis. On Defendant's motion, a mistrial was declared on September 18, 1980.[3]

The government's evidence consisted primarily of tape recordings of conversations between Defendant and Daniel Rodriguez, a convicted murderer imprisoned in the Hidalgo County jail. The tapes showed that Defendant had gone along with a plot, primarily schemed up by Rodriguez, whereby Rodriguez was to act as a middleman in securing the murder of Villanueva in exchange for McInnis' help in obtaining reduction of Rodriguez' jail sentence. The apparent motive for McInnis' involvement lay in the removal of Villanueva as a rival for the affections of Miss Parada, with whom Defendant had purportedly been having an affair.

The tapes clearly established that Defendant had lied before the Grand Jury. McInnis, however, had interposed defenses of diminished mental capacity and insanity to the charges, contending that as a result of a mental disease or defect arising out of circumstances prior to and during his appearance before the Grand Jury he was unable to conform his conduct to the requirements of the law and thus lacked the specific intent necessary to commit perjury. McInnis presented expert testimony from one psychiatrist and one psychologist to back his contentions.[4] The government presented lay witnesses and its own experts to counter McInnis' defense. Following mistrial, McInnis moved for acquittal, alleging that the government had failed to adduce sufficient evidence to prove his sanity beyond a reasonable doubt. This Court, viewing the evidence in the light most favorable to the Government, denied Defendant's motion. Defendant then moved to dismiss the indictment, alleging the same grounds as his previous motion for acquittal, and claiming that a second trial was barred on Double Jeopardy grounds under the authority of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *United States v. Bodey*, 607 F.2d 265 (9th Cir. 1979). For the reasons set forth below, this Court feels that Defendant's motion is frivolous and so lacking in merit that it presents no substantial question for appellate review.[5]

2. *United States v. McInnis*, 601 F.2d 1319 (5th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).

3. The jury was hopelessly deadlocked despite the giving of a modified *Allen* charge. One perjury count had earlier been dismissed by the Court on Defendant's motion at the close of the government's case. Defendant Parada was acquitted by the jury on the lone perjury count against her.

4. Defendant also presented lay testimony from five attorneys and a retired state district judge who testified as to Defendant's character and reputation. Judge Magus Smith rendered an opinion, based on a hypothetical paralleling the facts in this case, that Defendant's conduct in his Grand Jury appearance would not be consistent with his character. This testimony, however, bears no direct relationship to the issue of Defendant's sanity at the time of the alleged offense.

5. The validity of Defendant's *Abney* appeal has seriously been put into question by the recent

Fifth Circuit decision in *United States v. Becton*, 632 F.2d 1294 (5th Cir. 1980). The *Becton* panel held that the Court of Appeals lacked jurisdiction to consider an interlocutory appeal which, though asserting former jeopardy, in fact raised only denial of a motion to acquit. It was further held that sufficiency of the evidence at a first trial which ends in mistrial is subject to appellate review from conviction in a second trial, should one occur.

The *Becton* decision disregards earlier Fifth Circuit dictum in *United States v. Wilkinson*, 601 F.2d 791, 795 (5th Cir. 1979) which stated that such a decision would be appealable under *Abney*. The possibility exists, however, that *Becton* does not preclude Defendant's appeal since it speaks in terms of declining jurisdiction in "all criminal trials in which a motion to acquit for insufficiency of evidence is made and denied". *Becton, supra* at 1297. *Becton* did not involve an insanity defense, and since such must be affirmatively placed in issue by a Defendant, the present case may not fall into the extremely broad category which is denounced therein. (It should be noted that the landmark

## II. FINDINGS OF FACT

1. On June 7, 1978, Oscar B. McInnis was the criminal district attorney for Hidalgo County, Texas, had been a prosecutor for Hidalgo County for the previous twenty-two years, and was well acquainted with Grand Jury procedure.

2. During his appearance before the Grand Jury, Defendant McInnis appeared to lay observers to be well composed, calm and collected. He appeared responsive and deliberate in answering questions and displayed no bizarre or irrational behavior at any time. Defendant testified before the Grand Jury over a period of approximately one hour.

3. During the course of the Grand Jury investigation, Defendant McInnis answered truthfully and acknowledged knowing Noe Villanueva, Patricia Parada and Daniel Rodriguez. He was able to expound truthfully and articulately on the marital difficulties between Noe Villanueva and Patricia Parada, and about attempts made to obtain early parole for Daniel Rodriguez. He completely denied knowledge of or participation in the alleged plot to murder Noe Villanueva.

4. Defendant was advised prior to testifying of his Fifth Amendment right against self incrimination, and that he could invoke this privilege freely during the course of the Grand Jury's examination. Defendant answered that he understood and indicated he would avail himself of the privilege if necessary. Defendant was further warned that his testimony would be given under oath, and that anything he said could be used against him in a court of law. Defendant indicated that he understood this also.

5. Prior to his appearance before the Grand Jury, Defendant was unaware of the existence of tape recordings of conversations between him and Daniel Rodriguez wherein the plot to murder Noe Villanueva was discussed.

6. During the course of the Grand Jury examination of the Defendant, and after listening to tape recordings wherein the alleged plot to murder Noe Villanueva was discussed between Defendant and Daniel Rodriguez, Defendant refused to answer certain questions on at least ten separate occasions. On the first occasion, Defendant responded to government questioning as follows:

Q. Mr. McInnis, that tape was recorded on Wednesday, May the 24th, in the Hidalgo County Jail. Do you recognize the voices on that tape?

A. I won't answer that since you (government's counsel) played it.

7. Defendant responded to the queries of government counsel with respect to two questions he refused to answer as follows:

A. I won't answer that question.

Q. Are you refusing to answer that, as much as it may incriminate you?

A. Right, since you are accusing me, I am not going to answer the question.

   .    .    .    .    .

A. I decline to answer that question.

Q. Is that on the Fifth Amendment?

A. That's right.

8. On two later occasions, Defendant explains refusal to answer questions as follows:

A. I don't believe I'll answer that question.

Q. So you decline to answer that question?

A. I do, since I am the target of the investigation.

   .    .    .    .    .

Supreme Court decision in *Burks, supra*, heavily relied on by Defendant, precluded a second trial on double jeopardy grounds where the intermediate appellate court had found that the government had failed to adduce sufficient evidence as to a defendant's sanity at the first trial and had reversed his conviction. The Supreme Court held that a new trial would be improper, since the government should not be given a "second bite at the apple" to bolster its case by supplying evidence it had failed to muster at the first trial, and ordered the trial court to enter a judgment of acquittal. 437 U.S. at 17–18, 98 S.Ct. at 2150.)

A. I decline to answer that question on the Fifth Amendment. All of it is for that reason. If I decline to answer, it is based on my constitutional rights and that does not mean I have anything to hide, it's just that I have the right not to answer certain questions that you would later probably try to use against me.

9. Defendant terminated any questioning regarding the actual investigation as follows:

A. I didn't, but I am not going to answer any more questions along that line since I am the target of this investigation.

Q. That based upon your Fifth Amendment privilege?

A. Based upon my rights, that's right. Because I don't have any interest in whether the man lives or whether he dies, this fellow you are talking about, Villanueva.

10. After his initial appearance, and after a break of about fifteen minutes, Defendant returned to the Grand Jury room and spoke to those present, relating his personal history and accomplishments and asking them to consider this before taking any action. There was no further interrogation of Defendant, and he did not recant any false statements made earlier to the Grand Jury.

11. A tape recording made on May 21, 1978, reveals that Defendant and Daniel Rodriguez, while discussing arrangements for the alleged hit man to locate Villanueva, had the following conversation:

OM: Course don't ever mention to nobody about...

DR: Don't worry about ...

OM: The damn thing and *I won't either.* And the girl don't... One reason I ain't telling her much, I don't want her to know you know.

12. Defendant filed notice of intent to rely on the defense of diminished mental capacity on May 9, 1980, and filed notice of intent to rely on the defense of insanity on August 13, 1980.

13. Defendant did not rely on insanity defenses in state criminal proceedings against him in 1978 (which were dismissed before trial) or in state civil proceedings which resulted in his disbarment in 1979. These actions arose out of the same activities to which the present case relates to.

14. Defendant's expert witnesses, psychologist Erin D. Bigler and psychiatrist Richard J. Alexander, initially observed Defendant in June and July of 1978 for approximately six to eight hours. They did not then focus on the Grand Jury investigation or the perjury counts which are involved in this case. They again observed Defendant in August 1980 for approximately three hours, and subjected him to a sodium amytal test, the results of which weighed heavily in formulation of their opinions that Defendant had suffered from severe anxiety which prevented him from conforming his conduct to the requirements of the law during the Grand Jury session.

15. The government's expert witnesses, psychologist Jerome Brown and psychiatrist John D. Nottingham, Jr., observed Defendant in May of 1980 for approximately two hours.

16. On direct examination, Dr. Erin Bigler testified that Defendant was highly intelligent, and possessed no organic brain damage. He further testified that Defendant suffered from a "compulsive personality disorder with narcissistic features" and that as he aged, Defendant had experienced an "adjustment reaction of adult life with disturbance of emotions and conduct", partially as a result of his liaison with Miss Parada. Defendant was allegedly able to shield any symptoms of the latter in the public aspects of his life. During his appearance before the Grand Jury on June 7, 1978, Defendant allegedly suffered a severe anxiety attack, which was exacerbated by the present disorders, and which he was able to internalize. Defendant was able to handle this anxiety by denying any participation in the plot to murder Villanueva. Dr. Bigler testified that as a result of that anxiety, Defendant was unable to conform his con-

duct to the requirements of the law by telling the truth, although he was able to appreciate the wrongfulness of his conduct. Despite this anxiety, Dr. Bigler testified that Defendant was able to respond truthfully about questions regarding his professional capacity.

17. On cross-examination, Dr. Bigler stated that Defendant was never put on any type of treatment and had no prior history of mental illness. He refused to state that his opinion as to Defendant's alleged character disorders was to a medical certainty, acknowledged that in that area other opinions could be entertained, and admitted that his evidence of overwhelming anxiety during the Grand Jury session came from recent examinations of Defendant in August 1980. Dr. Bigler further testified that Defendant had a general recollection of the alleged plot during his appearance before the Grand Jury, that he "thought" Defendant was able to internalize his anxiety, since he "wasn't there to observe it",[6] and that a normal person in the Defendant's position would have become anxious before the Grand Jury. Dr. Bigler also stated that he couldn't say that Defendant ever went into a dissociative state [7] during his Grand Jury appearance, that he thought Defendant had never made advance plans to lie, and admitted that Defendant could have thought that his Grand Jury appearance was a situation where it was Defendant's word against that of a convicted murderer, Daniel Rodriguez, as to the existence of the plot.

18. On direct examination, Dr. Richard J. Alexander reiterated Dr. Bigler's view that Defendant suffered from certain personality disorders, and added that in order to control the anxiety in his Grand Jury appearance Defendant had utilized a form of denial characterized as a "primative defense mechanism" which was active within his psyche, and thus could not conform his conduct to the requirements of the law. He again agreed with Dr. Bigler in stating that Defendant realized his answers were incorrect when he gave them, that Defendant was able to internalize his anxiety, and that Defendant had no specific intent to lie. He added that the anxiety had produced psychogenic amnesia [8] which was proven by the sodium amytal test in August 1980, but went further than Dr. Bigler in stating that Defendant had gone into a dissociative state. Dr. Alexander further stated that Defendant did not have a distorted view of what was happening during his Grand Jury appearance.

19. On cross-examination, Dr. Alexander admitted that Defendant was able to recall the events he was asked about during his Grand Jury appearance, and that a person who possessed a compulsive personality disorder would be prone to tell the truth.[9] Dr. Alexander further admitted that Defendant was able to make a knowledgeable, succinct statement with respect to a complex question regarding one aspect of the jail house plot with Daniel Rodriguez, that he never asked Defendant about the possibility of premeditation to lie, that he couldn't exclude that Defendant lied in order to escape punishment, and that lying in such a situation would be normal. Dr. Alexander acknowledged that sodium amytal examination was an inexact science, but again stated that Defendant had gone into a state of dissociation before the Grand Jury.

20. Dr. Jerome Brown testified that based on substantial documentary evidence he had

---

**6.** Testimony of Dr. Erin Bigler, Transcript at 118.

**7.** A dissociative reaction results from the splitting off of a group of mental processes from the main body of consciousness. *See* testimony of Dr. Erin Bigler, Transcript at 130, 133–34.

**8.** Psychogenic amnesia is loss of memory which originates in the mind or from a mental condition or process. Dr. Alexander testified that Defendant could not recall the events that

transpired during the Grand Jury session because of amnesia which was produced from the overwhelming stress and anxiety Defendant allegedly experienced at that time. Testimony of Dr. Richard J. Alexander, Transcript at 163–68.

**9.** In fact, Dr. Alexander testified that people who possess compulsive personality disorders tend to make good professionals, including judges and lawyers. Testimony of Dr. Richard J. Alexander, Transcript at 172–73.

before him that Defendant was free of mental defect or illness, and had never suffered from any severe psychological disturbance. He found no evidence that Defendant had suffered from overwhelming anxiety during his Grand Jury appearance, and it appeared to him that Defendant had exercised selective judgment in deciding when to tell the truth and when to lie before the Grand Jury. Dr. Brown testified that Defendant's behavior before the Grand Jury was consistent with a "planned cover-up", that Defendant was fully aware of the substance of the Grand Jury's inquiry, and that he was not suffering from a mental disease or defect during his Grand Jury appearance and could have conformed his conduct to the requirements of the law. Dr. Brown pointed out that after his initial Grand Jury appearance, Defendant had an opportunity to recant his false testimony but did not, and that Defendant was able to make judgments without interference from any mental illness, if such were indeed present.

21. On cross-examination, Dr. Brown testified that persons who possessed a rigid personality were not as prone to stress as other persons, that Defendant was probably very upset during his Grand Jury appearance, and admitted that theoretically, anxiety could produce an adjustment disorder,[10] but he found no evidence thereof in this case. Dr. Brown explained, however, that an adjustment reaction could consist of any mild to moderate life difficulty. He further testified that he found no evidence that Defendant was confused or disorganized, that Defendant was in satisfactory possession of his faculties before the Grand Jury, and that he found no evidence of psychogenic amnesia present in Defendant. Also, Dr. Brown explained that Mr. McInnis' refusal

to answer a question after the playing of the jail-house tapes during the Grand Jury proceeding was an exercise of Defendant's Fifth Amendment right against self incrimination. Dr. Brown did admit that he had not listened to the tape recordings of the Grand Jury session, and acknowledged that listening to that tape could lead to different impressions than those gained from reading the transcript of the testimony.

22. Dr. John Nottingham testified that he found no evidence of psychosis or amnesia present in Defendant, and that his observations led to the conclusion that Defendant had the capacity to answer questions either truthfully or untruthfully during the Grand Jury examination. Dr. Nottingham admitted that Defendant underwent a "transient episode of rather significant anxiety" during his Grand Jury appearance, but that he thought Defendant retained self-control during the Grand Jury session to where it would not render him incapable of conforming to the requirements of the law. He further testified that Defendant had conformed with the requirements of the law by exercising his Fifth Amendment rights twelve times, and that Defendant's false statements were as consistent with a man trying to save himself as they were with a man being unable to conform his conduct with the requirements of the law because of mental disease or defect.[11]

23. On cross-examination, Dr. Nottingham acknowledged that anxiety was common in people with adjustment disorders, and that the anxiety might amount to a "mental illness of a transient nature".[12] He explained, however, that while theoretically anxiety could prevent somebody from conforming to the requirements of the law,

---

10. On at least one occasion, the anxiety itself is classified as the "adjustment disorder" by a defense expert. Testimony of Dr. Erin Bigler, Transcript at 91–92. Dr. Alexander never characterized this disorder in such a manner.

11. Defense counsel, in his motion for acquittal, taking this observation by Dr. Nottingham in isolation, claims that where two possibilities are equally consistent, the Government has failed to prove sanity beyond a reasonable doubt. The case law appears to be that in such

a situation it is proper to submit a case to the jury. *See United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir. 1978); *Blake v. United States*, 407 F.2d 908, 914–15 (5th Cir. 1969).

12. It is not the duty of courts to debate as to the permanency or lack of permanency of the mental disease or defect for purposes of the Fifth Circuit's test for legal insanity, *United States v. Bass*, 490 F.2d 846, 851 (5th Cir. 1974).

that that person would probably be able to correct it later. He further explained that such a high level of anxiety could not happen very easily, especially in a person with a rigid type personality. Dr. Nottingham stated that he did not think Defendant had a personality disorder, and that while Defendant suffered a significant level of stress in his Grand Jury appearance, he would not be overwhelmed by the situation. Dr. Nottingham further felt that Defendant had not gone into a dissociative state. In analyzing some of Defendant's responses, Dr. Nottingham explained that refusal to answer certain questions was not a form of psychiatric denial, as alleged by Dr. Alexander, and explained that denial in the psychiatric sense was a pushing out of a person's awareness certain facts to the point that they are psychologically unavailable to that person to answer at a particular time. He further explained that the false "denials" that Defendant made were not denials in the psychiatric sense.

24. On rebuttal, Dr. Alexander testified that Defendant was denying the reality he was involved in during his Grand Jury appearance in an attempt to escape the anxiety he was being subjected to. Dr. Alexander stated that Defendant did not consider the Fifth Amendment until it had been offered by the Government's attorneys, and thus he was not conforming his conduct with the requirements of the law.

## III. CONCLUSIONS OF LAW

In *Blake v. United States*, 407 F.2d 908 (5th Cir. 1969) (en banc), the Fifth Circuit adopted the Model Penal Code standard for defining lack of mental capacity to commit a crime.[13] *Blake* states that "[a] person is

not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law". *Id.* at 916. In the present case, it is undisputed that Defendant appreciated the wrongfulness of his conduct during his appearance before the Grand Jury. The issue before us, then, is whether Defendant was suffering from a mental disease or defect during his Grand Jury appearance, and if so, whether this disease or defect prevented him from conforming his conduct to the requirements of the law.

■ Once a Defendant has introduced evidence as to insanity, the presumption of sanity vanishes, and the burden shifts to the government to prove Defendant's sanity at the time of the offense beyond a reasonable doubt. *United States v. McCracken*, 488 F.2d 406 (5th Cir. 1974); *Blake, supra.* The issue then is whether the evidence adduced by the government is sufficient to make a jury question. Defendant would have us believe that in the case at bar, "reasonable doubt must necessarily have existed in the minds of reasonable jurors regarding [Defendant's] sanity". *Nagell v. United States*, 392 F.2d 934, 935 (5th Cir. 1968). This court cannot make such a determination.

A sufficiency of the evidence point in these circumstances must be examined under the premise that "each [case] must be decided upon its own facts, with careful attention to the weight of the evidence on each side". *Id.* The essential facts of this case, as set out previously, are not especially peculiar.[14] Defendant's evidence as to

---

13. Defendant has not couched any of his motions in relation to his "diminished mental capacity" defense. The *Blake* decision, however, contemplates no distinction between that defense and the defense of "insanity". *Blake, supra* at 915.

14. To summarize, there is evidence that Defendant was a morally scrupulous man who was engaged in a clandestine love affair, but there is no objective evidence to show that Defendant has ever suffered from a mental

disease or defect. There is evidence of Defendant's involvement in a criminal plot, and of his premeditation to lie if asked about it. Defendant's ignorance of the incriminating tapes leads to the impression that during his Grand Jury appearance Defendant could very well have thought that any incriminating evidence the Grand Jury had before it consisted solely of the testimony of Daniel Rodriguez, a convicted murderer. It was not until *after* the tapes were played that Defendant refused to answer certain incriminating questions and terminated all

insanity consisted solely of the opinion testimony of his two experts. Both experts concluded that Defendant was unable to conform his conduct to the requirements of the law by telling the truth during his appearance before the Grand Jury. Although they had both observed Defendant in June and July of 1978, shortly after the offense occurred, they did not focus on the Grand Jury appearance in their interviews, as Defendant had not yet been indicted for perjury. Admittedly, the evidence they primarily based their opinions on did not come to light until much later interviews and testing in August of 1980.

■ It is well settled that expert opinions are not binding on the trier of fact if there is reason to discount them. *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967). *Mims* sets out several factors by which expert opinion evidence might successfully be rebutted without the necessity of expert testimony for the prosecution.[15] These include showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, the interest or bias of the expert, material variations among the experts themselves, inconsistencies or contradictions of an expert's testimony as to material matters, expert medical testimony predicated on subjective symptoms, and successful cross-examination by the government. One or more of these factors may make a jury issue as to the weight and credibility to be given to the expert testimony. *Id.* at 143–44. All of the factors set out above are present here in varying degrees and support a finding that the government had sufficiently put Defendant's sanity in issue even without considering the testimony of government witnesses.

■ Dr. Alexander did not causally link Defendant's diagnosed "compulsive personality disorder" to the severe anxiety Defendant suffered during his Grand Jury appearance which allegedly kept him from conforming his conduct to the requirements of the law. His testimony as to that alleged disorder leads to the impression that it had little or no direct bearing on Defendant's ability to conform under the *Blake* test.[16] Dr. Bigler and Dr. Alexander also disagree to some extent as to their characterization of the alleged "adjustment reaction" disorder,[17] and on cross-examination, Dr. Bigler stated that he could not state, as Dr. Alexander did, that Defendant ever went into a "dissociative state" during the Grand Jury appearance. On cross-examination, Dr. Bigler indicated that observation of Defendant was important in determining whether he had internalized his anxiety, admitted that anxiety would be a normal reaction in a person appearing before a Grand Jury, and admitted that he could not exclude the possibility that Defendant might have made advanced plans to lie. Dr. Alexander also stated on cross-examination that he could not exclude the possibility that Defendant had lied in order to escape punishment, and admitted that lying in such a situation would be normal.[18] Dr. Bigler testified that he thought Defendant

---

questioning regarding the investigation. Defendant thereafter related to the Grand Jury the misdeeds of Noe Villanueva which led to his efforts to help Miss Parada and informed them of his long career in law enforcement in an apparent effort to convince them not to return an indictment against him.

That we do not have a strange case before us is bolstered by the testimony of Dr. Bigler that anxiety would be a normal reaction in a person appearing before a Grand Jury, and the testimony of Dr. Alexander that lying in order to escape punishment would be normal in such a situation.

**15.** *See McCracken, supra* at 411 n.4. That the government uses its own experts in rebuttal in no way invalidates any *Mims* criteria. *Id.*

**16.** An accused may have a mental disease or disorder and still be mentally competent to be held responsible for a crime. *United States v. Kohlmann*, 491 F.2d 1250, 1252 (5th Cir. 1974); *Mims, supra* at 142.

**17.** *See* note 10, *supra.*

**18.** Cross-examination which elicits testimony from a Defense expert to the effect that a possibility that is consistent with sanity cannot be ruled out is to be accorded great weight in this context. *See, United States v. Mota*, 598 F.2d 995 (5th Cir. 1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

never made advanced plans to lie, and Dr. Alexander stated that he never asked Defendant about the possibility of advanced plans to lie.[19] Dr. Alexander stated that Defendant utilized a form of psychiatric denial during his Grand Jury appearance and was trying to escape the reality he was involved in, yet he also stated that Defendant was able to perceive that his answers were incorrect during the Grand Jury appearance, that Defendant did not have a distorted view of reality during such appearance, and that Defendant made a knowledgeable, succinct statement regarding some complex questioning during the Grand Jury session.

■ It is thus apparent that Defendant's insanity defense, constructed entirely on expert medical opinion, was placed in question by the government's cross-examination and the other *Mims* factors present. This alone would suffice to create a jury question on insanity. In addition, the government's lay witnesses testified that they had observed Defendant for approximately one hour during his Grand Jury appearance, and had observed no symptoms of overwhelming anxiety. It is established that expert testimony may be successfully rebutted by lay testimony. *United States v. Makris*, 535 F.2d 899 (5th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977).

Defendant's experts theorized that Defendant had undergone tremendous internalized anxiety, which was revealed to them more than two years later as a result of a sodium amytal examination. This theory was premised on the fact that Defendant was unable to recall the details of his Grand Jury appearance while under the influence of sodium amytal, an indication that he was under severe stress at the time. Yet, Dr. Alexander admitted that sodium amytal examination was an inexact science, and it cannot be said that Defendant's recollection of the events improved with time. Dr. Bigler stated that the "internalization" of the anxiety was pure conjecture on his part, as he hadn't been there to observe it. This lends great weight to the testimony of the government's lay witnesses, who were able to observe Defendant directly during his Grand Jury appearance.

Finally, the government's own expert witnesses testified that they found no evidence that Defendant had ever suffered from a severe mental disturbance. This, along with the fact that Defendant had no history of mental illness and never was put on any type of treatment, was sufficient to question whether the *sine qua non* of the *Blake* test, that Defendant was suffering from a mental disease or defect, had been established. The government experts further stated that while Defendant probably did experience anxiety during his Grand Jury appearance, it would not have rendered him incapable of conforming his conduct to the requirements of the law, and indeed, they felt that Defendant had conformed by refusing to answer certain incriminating questions. Further, Dr. Nottingham directly rebutted Dr. Alexander's theory that Defendant had gone into dissociative state and exercised a form of psychiatric denial.

■ The nature and quantum of rebuttal is determined to some degree by the case of insanity made out by a Defendant. *United States v. Fratus*, 530 F.2d 644 (5th Cir. 1976), *cert. denied*, 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976); *Nagell, supra.* In the present case, Defendant's case for insanity, as developed from the facts and Defendant's experts, is questionable and was successfully rebutted by the *Mims* factors set out previously, by the lay testimony adduced by the government, and by the government's own experts. Viewing all of the evidence, this Court cannot conclude that a reasonable doubt must have existed in the minds of the jurors regarding Defendant's sanity and finds that the government successfully put Defendant's sanity in issue under the contested portions of the *Blake* test. For the reasons heretofore stated, this Court finds Defendant's double jeopardy claim to be frivolous.

---

**19.** *See* Finding of Fact number 11, *supra.*